**THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA**

SAM KUNAKNANA, et al.,

      Plaintiffs,

    v.

UNITED STATES ARMY CORPS
OF ENGINEERS, et al.,

      Defendants,

   and

CONOCOPHILLIPS ALASKA, INC., et
al.,

      Intervenor-Defendants.

CENTER FOR BIOLOGICAL
DIVERSITY,

      Plaintiff,

    v.

UNITED STATES ARMY CORPS
OF ENGINEERS, et al.,

      Defendants,

   and

CONOCOPHILLIPS ALASKA, INC., et
al.,

      Intervenor-Defendants.

Case No. 3:13-cv-00044-SLG
Case No. 3:13-cv-00095-SLG

## ORDER RE MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs Sam Kunaknana, et al. ("Kunaknana Plaintiffs") and the Center for

Biological Diversity ("CBD") filed separate lawsuits challenging Defendant U.S. Army

Corps of Engineers'[1] decision to issue a permit to ConocoPhillips Alaska, Inc. to fill certain wetlands in the National Petroleum Reserve – Alaska ("NPR-A") in order to develop a drill site known as Colville Delta 5 ("CD-5").[2]  In their complaints, Plaintiffs assert that the Corps' issuance of the permit violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4327, and Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344.[3]  ConocoPhillips, the Arctic Slope Regional Corporation ("ASRC"), the State of Alaska, the North Slope Borough, and Kuukpik Corporation have joined both actions as Intervenor-Defendants in support of the Corps.[4]  Kuukpik is the

---

[1] Both actions named as defendants the Corps as well as Corps officers Thomas P. Bostick and Christopher D. Lestochi.  This Order refers to all three defendants collectively as "the Corps."

[2] Docket 106 at 4, Case No. 3:13-cv-00044 (CBD Mot. for Summ. J.); Docket 107 at 2, Case No. 3:13-cv-00044 (Kunaknana Pls.' Mot. for Summ. J.).

[3] *See* Docket 117 at 1–2 ¶¶ 1–2, Case No. 3:13-cv-00044 (Kunaknana Pls.' First Am. Compl.); Docket 1 at 2 ¶ 1, Case No. 3:13-cv-00095 (CBD Compl.).  In its complaint, CBD also asserted that the Corps' issuance of the permit violated the Endangered Species Act ("ESA").  Docket 1 at 30–34 ¶¶ 141–60, Case No. 3:13-cv-00095.  However, CBD did not raise any ESA claims in its motion for summary judgment.  The Court need not reach the ESA issue because it concludes that CBD lacks standing.  *See infra* Discussion Part I.B.i.  And in any event, CBD has waived its ESA claims.  *See* Docket 131 at 42–43, Case No. 3:13-cv-00044 (Corps Opp'n to Mot. for Summ. J.) (citing, e.g., *City of Santa Clarita v. U.S. Dep't of Interior*, No. CV 02-00697DT, 2006 WL 4743970, at *11 (C.D. Cal. Jan. 30, 2006)).

[4] In *Kunaknana, et al. v. U.S. Army Corps of Engineers, et al.*, Case No. 3:13-cv-00044-SLG, see Docket 14 (Order Granting ConocoPhillips Mot. for Intervention), Docket 25 (Order Granting ASRC Mot. for Intervention), Docket 38 (Order Granting State of Alaska Mot. for Intervention), Docket 51 (Order Granting Kuukpik Mot. for Intervention), and Docket 86 at 2 (Order Establishing Joint Case Mgt.) (granting intervention to North Slope Borough).  In *Center for Biological Diversity v. U.S. Army Corps of Engineers, et al.*, Case No. 3:13-cv-00095-SLG, see Docket 22 (Order Granting ConocoPhillips Mot. for Intervention), Docket 29 at 2 (Order Establishing Joint Case Mgt.) (granting intervention to State of Alaska, ASRC, North Slope Borough, and Kuukpik).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 2 of 58

Alaska Native Claims Settlement Act village corporation for the Inupiat Eskimo Village of Nuiqsut.[5]

Challenges to agency decisions brought in this federal district court are resolved through summary judgment motions.[6] Pursuant to the Court's Order Establishing Joint Case Management and a Case Schedule, the summary judgment motions in the two lawsuits have been jointly managed.[7] Presently before the Court are CBD's and the Kunaknana Plaintiffs' Motions for Summary Judgment.[8] The Corps and Intervenor-Defendants have each filed a single response in opposition to both Plaintiffs' motions,[9] which also serves as a cross-motion for summary judgment,[10] and Plaintiffs have

---

[5] Docket 47 at 2 ¶ 2 (Chinn Decl. in Supp. of Kuukpik Mot. to Intervene).

[6] *See* D.Ak. LR 16.3(c); *see also City & Cnty. of S.F. v. United States*, 130 F.3d 873, 877 (9th Cir. 1997) ("'[T]he function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.' In reviewing an administrative agency decision, 'summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.'" (citation omitted) (quoting *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985))).

[7] Docket 86, Case No. 3:13-cv-00044-SLG (Order Establishing Joint Case Mgt.). The order directed the parties in both cases to filed their summary judgment briefs and replies in *Kunaknana, et al. v. U.S. Army Corps of Engineers, et al.*, Case No. 3:13-cv-00044-SLG. Accordingly, unless otherwise indicated, all subsequent docket references in this Order are to Case No. 3:13-cv-00044-SLG.

[8] Docket 106 (CBD Mot. for Summ. J.); Docket 107 (Kunaknana Pls.' Mot. for Summ. J.).

[9] Docket 131 (Corps Opp'n); Docket 129 (ConocoPhillips Opp'n); Docket 140 (ASRC Opp'n); Docket 141 (Kuukpik Opp'n); Docket 142 (State of Alaska Opp'n); Docket 143 (North Slope Borough Opp'n). ConocoPhillips also filed a copy of its opposition at Docket 127. However, in this Order the Court references only Docket 129 when discussing ConocoPhillips's opposition. Additionally, the Corps and ConocoPhillips later filed Notices of Errata at Dockets 135 and 144, respectively, that corrected certain citations in their briefs.

[10] *See* D.Ak. LR 16.3(c)(2) ("Defendant's principal brief in opposition . . . will be deemed a cross-motion for summary judgment . . . .").

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 3 of 58

replied.[11]  No party requested oral argument, and oral argument was not necessary to the Court's decision.

For the reasons discussed herein, CBD's action will be dismissed because CBD lacks standing.  The Kunaknana Plaintiffs' Motion for Summary Judgment will be granted on their NEPA claim to the extent they assert that the Corps failed to provide a reasoned explanation in the record for its decision not to conduct a supplemental NEPA analysis.  This Order does not determine whether a supplemental NEPA analysis is required, nor does it determine the appropriate remedy for the Corps' NEPA violation.  This Order also does not resolve the Kunaknana Plaintiffs' CWA claim.  Instead, the Court requests further briefing from the parties as to how this case should proceed at this juncture.

**STATUTORY FRAMEWORK, FACTUAL BACKGROUND,
AND PROCEDURAL HISTORY**

**I.  Statutory and Regulatory Framework.**

**A. *Section 404 of the Clean Water Act.***

Congress enacted the CWA "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."[12]  To achieve this goal, the CWA prohibits the

---

[11] Docket 146 (Kunaknana Pls.' Reply); Docket 147 (CBD Reply).  Also before the Court is a Consolidated Motion to Strike Plaintiffs' Extra-Record Summary Judgment Exhibits filed by ConocoPhillips.  Docket 126 (ConocoPhillips Mot. to Strike).  That motion is discussed in Discussion Part IV.B.ii.a, *infra*.

[12] 33 U.S.C. § 1251(a).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 4 of 58

discharge of any pollutant into navigable waters unless authorized by a permit.[13] "Navigable waters" includes certain wetlands,[14] such as the area in dispute here.

Section 404 of the CWA governs permitting for the discharge of dredged or fill material into navigable waters.[15] The Corps is responsible for issuing Section 404 permits, and it does so according to EPA's Section 404(b)(1) Guidelines.[16] Those guidelines state in relevant part: "[N]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."[17] This provision requires the Corps to select what the parties in this controversy refer to as the Least Environmentally Damaging Practicable Alternative, or "LEDPA."

---

[13] *See* 33 U.S.C. § 1311(a).

[14] The CWA defines "navigable waters" as "the waters of the United States." 33 U.S.C. § 1362(7). Corps and EPA regulations define "waters of the United States" to include wetlands. *See* 33 C.F.R. § 328.3(a) (Corps regulation); 33 C.F.R. § 230.3(s) (EPA regulation). The Ninth Circuit has clarified that the CWA only covers wetlands adjacent to or having a "significant nexus" to navigable waters. *See N. Cal. River Watch v. City of Healdsburg*, 496 F.3d 993, 1000 (9th Cir. 2007) (citing *Rapanos v. United States*, 547 U.S. 715 (2006) (Kennedy, J., concurring)).

[15] *See* Clean Water Act § 404, 33 U.S.C. § 1344.

[16] *See* 33 C.F.R. § 320.4(a)(1) ("For activities involving 404 discharges, a permit will be denied if the discharge that would be authorized by such permit would not comply with the [EPA's] 404(b)(1) guidelines.").

[17] 40 C.F.R. § 230.10(a). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 5 of 58

### B. National Environmental Policy Act.

NEPA declares "a national policy . . . to promote efforts which will prevent or eliminate damage to the environment."[18] It is a procedural statute, designed to achieve its stated policy "by focusing Government and public attention on the environmental effects of proposed agency action," thereby ensuring "that the agency will not act on incomplete information, only to regret its decision after it is too late to correct," and that "the public and other government agencies [can] react to the effects of a proposed action at a meaningful time."[19] Regulations promulgated by the Council on Environmental Quality ("CEQ") provide guidance on the application of NEPA.

NEPA requires federal agencies to prepare an environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment."[20] In an EIS, an agency must take "a 'hard look' at the potential environmental consequences of [its] proposed action."[21] It must also "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available

---

[18] 42 U.S.C. § 4321.

[19] *Marsh v. Or. Natural Res. Def. Council*, 490 U.S. 360, 371 (1989); *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) ("Other statutes may impose substantive environmental obligations on federal agencies, but NEPA merely prohibits uninformed—rather than unwise—agency action."); *Native Vill. of Chickaloon v. Nat'l Marine Fisheries Serv.*, 947 F. Supp. 2d 1031, 1069 (D. Alaska 2013).

[20] 42 U.S.C. § 4332(C).

[21] *See League of Wilderness Defenders-Blue Mountain Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d 1060, 1075 (9th Cir. 2012) (quoting *League of Wilderness Defenders Blue Mountain Biodiversity Project v. Allen*, 615 F.3d 1122, 1135 (9th Cir. 2010)).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 6 of 58

resources."[22]   Under CEQ regulations, "[a] cooperating agency may adopt without recirculating the [EIS] of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied."[23]

In view of NEPA's purpose to ensure fully informed decision-making, "an agency that has prepared [or adopted] an EIS cannot simply rest on the original document. The agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a 'hard look at the environmental effects of [its] planned action . . . .'"[24]   CEQ regulations require the agency to prepare a supplemental EIS ("SEIS") if (1) "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns"; or (2) "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[25]   CEQ guidelines provide that "[a]s a rule of thumb, . . . EISs that are more than 5 years old should be carefully reexamined to determine if the[se] criteria . . . compel preparation of an EIS supplement."[26]   The

---

[22] 42 U.S.C. § 4332(E).

[23] 40 C.F.R. § 1506.3(c).

[24] *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557 (9th Cir. 2000) (quoting *Marsh*, 490 U.S. at 374).

[25] 40 C.F.R. § 1502.9(c)(1).

[26] Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,036 (Mar. 23, 1981).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 7 of 58

agency "must make a reasoned decision whether an SEIS is required," and if it decides an SEIS is not required, it must document that decision in the record.[27]

## II.   Factual Background.

### A. The NPR-A, the Colville River Delta, and the City of Nuiqsut.

Established in 1923, the NPR-A on Alaska's North Slope is "the largest single unit of public land in the United States and covers 23.6 million acres. It is also an important habitat for vegetation, fish, and wildlife."[28] In a 1980 appropriations bill, Congress directed the Secretary of the Interior to conduct "an expeditious program of competitive leasing of oil and gas in the [NPR-A]."[29] Presently, the Bureau of Land Management ("BLM") administers the NPR-A.

In the eastern half of the NPR-A, the Colville River flows east along the southern boundary and then north along the eastern boundary, eventually making its way through a large delta before emptying into the Beaufort Sea.[30] That delta, aptly termed the Colville River Delta, covers approximately 250 square miles[31] and "is relatively flat,

---

[27] *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 855 (9th Cir. 2013); *cf. Friends of the Clearwater*, 222 F.3d at 558–59 (finding NEPA violation where there was "no evidence in the record that . . . the Forest Service ever considered whether [certain pieces of new information] were sufficiently significant to require preparation of an SEIS").

[28] *N. Alaska Envt'l Ctr. v. Kempthorne*, 457 F.3d 969, 973 (9th Cir. 2006); *see also N. Alaska Envt'l Ctr. v. Norton*, 361 F. Supp. 2d 1069, 1072 (D. Alaska 2005) (providing background on the NPR-A).

[29] Act of Dec. 12, 1980, Pub. L. No. 96-514, 94 Stat. 2957; *see also* 42 U.S.C. § 6506a(a) ("The Secretary shall conduct an expeditious program of competitive leasing of oil and gas in the Reserve . . . .").

[30] *See* Administrative Record [hereinafter A.R.] 2516 (Special Areas NPR-A Map).

[31] A.R. 7490 (8/12/10 ConocoPhillips's Response to Review Officer's Questions).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 8 of 58

tundra-covered terrain, with local relief produced by a complex network of lakes interspersed with low-lying ridges and channels."[32]  It is the largest delta in northern Alaska, draining 29% of the North Slope.[33]  It is an area "recognized internationally for its biological diversity and richness" and "regionally for its importance to fish, wildlife, and subsistence resources."[34]

The City of Nuiqsut is one of only two permanent population centers within the Colville River Delta.[35]  Approximately 500 people live in Nuiqsut, which is located on the west bank of the Nigliq Channel of the Colville River, roughly 15–20 miles from the Beaufort Sea.[36]  The eastern boundary of the NPR-A is located just west of the Nigliq Channel, and Nuiqsut is just inside that boundary.[37]  "To this day, the Inupiat people of Nuiqsut have a subsistence-based economy, with caribou, moose, birds, fish, seals and bowhead whales as primary food sources."[38]

---

[32] A.R. 451 (2004 Alpine Satellites EIS).

[33] A.R. 4079 (6/9/09 Letter from EPA to Corps).

[34] A.R. 3297 (11/23/05 Letter from USFWS to Corps).

[35] A.R. 451 (2004 Alpine Satellites EIS); A.R. 2514 (Plan Area Vicinity and Location Map). Technically, the City of Nuiqsut is distinct from the Native Village of Nuiqsut, which refers to the Native community that is represented by Kuukpik.  Practically, however, the two are the same, as over 95% of Nuiqsut's residents "are Kuukpik shareholders, married to shareholders or children of shareholders."  *See* Docket 47 at 2 ¶ 2 (Chinn Decl. in Supp. of Kuukpik Mot. to Intervene).  The other permanent population center within the Colville River Delta is Colville Village, located very near the Beaufort Sea.  A.R. 451 (2004 Alpine Satellites EIS); A.R. 2514 (Plan Area Vicinity and Location Map).

[36] A.R. 451 (2004 Alpine Satellites EIS); Docket 47 at 2 ¶ 2 (Chinn Decl. in Supp. of Kuukpik Mot. to Intervene); *see also* A.R. 2514 (Plan Area Vicinity and Location Map).

[37] *See* A.R. 2514 (Plan Area Vicinity and Location Map).

[38] Docket 47 at 2 ¶ 3 (Chinn Decl. in Supp. of Kuukpik Mot. to Intervene).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 9 of 58

**B. The Alpine Oil Field and the 2004 Alpine Satellites EIS.**

In the winter of 1994–1995, ARCO Alaska and its partners discovered the Alpine oil field in the Colville River Delta.[39]  In 1998, the Corps issued a permit to ARCO to fill 98.4 acres in order to construct two drill pads, CD-1 and CD-2, as well as the Alpine Central Processing Facility ("ACPF"), located at CD-1.[40]  CD-1 and CD-2 are east of the Nigliq Channel but west of the Colville River mainstem and outside of the NPR-A.[41]  A pipeline and road connects CD-2 to CD-1, and CD-1 is connected via pipeline to the Trans-Alaska Pipeline that is further to the east.[42]  CD-1 and CD-2 are both approximately eight miles north of Nuiqsut.[43]

In 2001, ARCO's successor, ConocoPhillips, announced the discovery of additional oil in the area to the west of Alpine, including areas within the NPR-A.[44]  Thereafter, BLM initiated a review process pursuant to NEPA to assess the environmental impact of ConocoPhillips's proposal to develop five drill sites: CD-3 through CD-7.[45]  ConocoPhillips proposed placing 20 to 30 wells on each of the five pads, transporting unprocessed three-phase fluid (i.e., oil, water, gas) to ACPF for

---

[39] A.R. 306 (2004 Alpine Satellites EIS).

[40] A.R. 306 (2004 Alpine Satellites EIS); A.R. 6768 (2011 ROD).

[41] A.R. 2514 (Plan Area Vicinity and Location Map).

[42] *See* A.R. 306 (2004 Alpine Satellites EIS); A.R. 2514 (Plan Area Vicinity and Location Map); A.R. 2515 (Plan Area Map).

[43] *See* A.R. 451 (2004 Alpine Satellites EIS); A.R. 2514 (Plan Area Vicinity and Location Map).

[44] A.R. 306 (2004 Alpine Satellites EIS).

[45] A.R. 191, 288 (2004 Alpine Satellites EIS); *see also* A.R. 2387 (4/9/04 Public Notice of Application for Permit).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 10 of 58

processing, and then transporting processed oil to the Trans-Alaska Pipeline System.[46] The proposed CD-3 and CD-4 drill sites are located east of the Nigliq Channel and outside the NPR-A on land owned by the State of Alaska and Kuukpik, respectively.[47] CD-3 is to the north of CD-1 and CD-2, and CD-4 is to the south.[48] The proposed CD-5 drill site is to the west of CD-1 and CD-2, across the Nigliq Channel and within the northeastern boundary of the NPR-A.[49] The proposed CD-6 and CD-7 drill sites, which have not yet been developed, are even further to the west and within the NPR-A.[50]

The NEPA review process culminated in 2004 with the publication of the 2,500-page Alpine Satellite Development Plan Final EIS ("Alpine Satellites EIS").[51] The EIS was prepared by BLM together with four cooperating entities: the Corps, EPA, U.S. Coast Guard, and State of Alaska.[52] The EIS analyzes six alternatives: ConocoPhillips's proposed action (Alternative A), conformance with existing NPR-A lease stipulations without exception (Alternative B), alternative access routes (Alternative C), roadless development (Alternative D), no action (Alternative E), and BLM's preferred alternative (Alternative F).[53]

---

[46] A.R. 191, 288 (2004 Alpine Satellites EIS).

[47] A.R. 191, 288 (2004 Alpine Satellites EIS); *see also* A.R. 2515 (Plan Area Map).

[48] A.R. 2515 (Plan Area Map).

[49] A.R. 191, 288 (2004 Alpine Satellites EIS); *see also* A.R. 2515 (Plan Area Map).

[50] A.R. 2515 (Plan Area Map).

[51] A.R. 183–2730 (2004 Alpine Satellites EIS).

[52] A.R. 191 (2004 Alpine Satellites EIS).

[53] A.R. 318 (2004 Alpine Satellites EIS).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 11 of 58

Three of the EIS alternatives are relevant to this appeal. Alternative A includes construction of gravel roads and bridges "connect[ing] CD-4 through CD-7 to the existing Alpine Field road."[54] A proposed road would run from CD-2 west to CD-5 and would include a 1,200-foot bridge over the Nigliq Channel and an 80-foot bridge across a lake to access CD-5.[55] Alternative F is similar to Alternative A with respect to CD-5, except that it would require that the bridge across the Nigliq Channel extend further and that the approach to the bridge provide for natural water flow.[56] In Alternative C-1, the proposed road to CD-5 would be shifted to the south, with a bridge crossing the Nigliq Channel at a location southwest of CD-4.[57]

In December 2004, the Corps issued a Section 404 permit to ConocoPhillips for CD-3 and CD-4 based on the Alpine Satellites EIS.[58]

### C. The CD-5 Permitting Process.

#### i. 2005 Permit Application.

In September 2005, ConocoPhillips submitted an application to the Corps for a Section 404 permit to develop CD-5.[59] ConocoPhillips's proposal in this application was similar to Alternatives A and F in the Alpine Satellites EIS. ConocoPhillips proposed a 9.8-acre drill pad with up to 22 wells, a 4.2 mile gravel access road from CD-2 to CD-5,

---

[54] A.R. 319 (2004 Alpine Satellites EIS).

[55] A.R. 319, 843 (2004 Alpine Satellites EIS); A.R. 2515 (Plan Area Map).

[56] A.R. 321 (2004 Alpine Satellites EIS); A.R. 2574 (Alternative F Site Map).

[57] A.R. 320 (2004 Alpine Satellites EIS); A.R. 2569 (Alternative C-1 Site Map).

[58] *See* A.R. 5548–5618 (CD-3 & CD-4 ROD).

[59] A.R. 2995 (2005 Permit Application).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 12 of 58

a 1,250-foot bridge over the Nigliq Channel, and a shorter 80-foot bridge over a lake, with a total fill of 45.1 acres.[60]  According to Lanston Chinn, CEO of Kuukpik, the Nuiqsut community "vehemently opposed" the proposed location of the Nigliq Channel bridge in the 2005 proposal "because of concerns about long term erosion, potential impacts on fish habitat, sedimentation and navigability of the Channel, and other potential impacts of the proposed bridge on the community."[61]  Ultimately, in February 2008, ConocoPhillips asked the Corps to "suspend processing of the application for the CD 5 project while ConocoPhillips worked with the Native community to resolve project related issues."[62]  The Corps closed the application file in May 2008.[63]

> ii.  *Memorandum of Agreement Between Kuukpik and ConocoPhillips and 2009 Permit Application.*

In December 2008, Kuukpik and ConocoPhillips entered into a Memorandum of Agreement ("MOA") in which ConocoPhillips agreed to certain terms designed to ameliorate the impacts of the CD-5 project on the people of Nuiqsut.[64]  Specifically,

---

[60] A.R. 8808–10 (Public Notice re 2005 Permit Application).  Certain other documents indicate that the road length was 4.4 miles and the bridge 1375 feet.  *See* A.R. 4009 (3/13/09 Letter from ConocoPhillips to Corps); A.R. 6782 (2011 ROD).

[61] Docket 47 at 3 ¶ 6 (Chinn Decl. in Supp. of Kuukpik Mot. to Intervene).  "Under authority granted Kuukpik by a three-way resolution among the City of Nuiqsut, the Native Village of Nuiqsut and Kuukpik in 1995 (and since reaffirmed), Kuukpik has taken the lead in representing the Nuiqsut community on issues relating to oil and gas development on lands within the traditional subsistence range of the Kuukpikmiut (i.e., the Native people of Nuiqsut)."  Docket 47 at 2 ¶ 4.

[62] A.R. 3913 (4/15/08 Letter from Corps to ConocoPhillips).

[63] A.R. 3916 (5/15/08 Letter from Corps to ConocoPhillips).

[64] A.R. 4118 (7/21/09 Letter from Kuukpik to Corps); *see also* Docket 47 at 4 ¶ 8 (Chinn Decl. in Supp. of Kuukpik Mot. to Intervene) ("ConocoPhillips also entered into a [MOA] with Kuukpik

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 13 of 58

ConocoPhillips agreed to, among other things, help fund construction of a road connecting Nuiqsut to CD-5, make annual payments to a mitigation fund, seek to improve its local and Native hire programs, and provide for enhanced consultation with the local community regarding future projects.[65]  At the same time, in December 2008, ConocoPhillips resubmitted its permit application to the Corps.[66]

In May 2009, the Corps issued a public notice regarding ConocoPhillips's resubmitted permit application for CD-5.[67]  This 2009 application included several notable changes from ConocoPhillips's 2005 application.  The new application proposed relocating the drill pad 1.3 miles to the west and increasing the road length from 4.2 to 6.3 miles, increasing the size of the drill pad from 9.8 to 11.7 acres in order to accommodate up to 33 wells, and moving the Nigliq Channel bridge three miles south to a location near CD-4.[68]  The length of the Nigliq Channel bridge would be slightly

_____

that includes terms designed to avoid and to minimize, as well as mitigate many of the adverse sociocultural and socioeconomic impacts on the Kuukpikmiut from development.").

[65] A.R. 4133–41 (7/21/09 Letter from Kuukpik to Corps); *see also* Docket 47 at 4–5 ¶ 8 (Chinn Decl. in Supp. of Kuukpik Mot. to Intervene).

[66] A.R. 3970 (12/1/08 Letter from ConocoPhillips to Corps).

[67] A.R. 6769 (2011 ROD).  As noted above, December 2008 is the date the application was initially submitted.  A.R. 3970 (12/1/08 Letter from ConocoPhillips to Corps).  Thereafter, the Corps requested, and ConocoPhillips provided, additional information in order to complete the permit application.  A.R. 3977 (12/23/08 Letter from Corps to ConocoPhillips); A.R. 4001 (3/13/09 Letter from ConocoPhillips to Corps).  A public notice of the application was issued in May 2009.  A.R. 6769 (2011 ROD).  The parties refer to the year of this application differently, as either 2008 or 2009.  *See, e.g.*, Docket 108 at 21 (Kunaknana Pls.' Mot. for Summ. J.) (discussing 2008 permit application); Docket 129 (ConocoPhillips Opp'n) (discussing 2009 permit application).  The Court will use 2009 as the date of the application in order to be consistent with the 2011 ROD.

[68] A.R. 4009 (3/13/09 Letter from ConocoPhillips to Corps); A.R. 6769 (2011 ROD).  In a letter to the Corps, ConocoPhillips asserted that this bridge location "incorporates local knowledge provided by Kuukpik shareholders for the purposes of reducing ice jamming, providing for high

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 14 of 58

longer—1,405 feet.[69]  Additionally, ConocoPhillips's 2009 application did not include the 80-foot bridge originally proposed; instead, it included a 317-foot bridge over a different lake and a 277-foot bridge across a creek.[70]  The total amount of fill increased from the 45.1 acres proposed in 2005 to 62.1 acres.[71]

     *iii.*    *2010 Record of Decision and Administrative Appeal.*

In February 2010, the Corps issued a Record of Decision ("2010 ROD") denying ConocoPhillips's 2009 CD-5 permit application based on the Corps' determination that ConocoPhillips had failed to demonstrate that its revised proposal was the LEDPA.[72] The Corps identified two alternatives that it determined would have less environmental impact than ConocoPhillips's proposal because they "minimize impacts to aquatic resources within the floodplain of the [Colville River Delta]."[73]  The "key features" of both these alternatives was the use of a horizontal directional drilling ("HDD") pipeline crossing under the Nigliq Channel and the resultant elimination of the road and bridge across the Colville River Delta to join CD-5 to ConocoPhillips's existing Alpine

---

and stable banks, avoiding popular subsistence fishing areas, and avoiding historic landmarks." A.R. 4009 (3/13/09 Letter from ConocoPhillips to Corps).

[69] A.R. 4009 (3/13/09 Letter from ConocoPhillips to Corps).

[70] A.R. 3926 (12/1/08 CD-5 Project Description).

[71] A.R. 4009 (3/13/09 Letter from ConocoPhillips to Corps).  The 2011 ROD lists the amount of fill in the 2009 proposal as 62.2 acres.  *See* A.R. 6782 (2011 ROD).

[72] A.R. 4792–93 (2010 ROD); A.R. 6770 (2011 ROD).

[73] A.R. 4793 (2010 ROD).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 15 of 58

infrastructure.[74]   One alternative included a gravel air strip at CD-5, and the other included an eight-mile road to CD-5 from Nuiqsut.[75]

ConocoPhillips administratively appealed the 2010 ROD on numerous grounds.[76] In Appeal Reason 3, ConocoPhillips asserted the Corps' LEDPA determination was "arbitrary, capricious, . . . [and] not supported by substantial evidence in the administrative record."[77]   ConocoPhillips maintained that the record "does not support a finding that a three-phase HDD project design is a practicable alternative to [ConocoPhillips's] CD-5 proposal."[78]

In a decision dated December 2, 2010, a Corps Review Officer determined that "[m]any of the stated reasons in ConocoPhillips's [request for appeal] are without merit, however . . . several aspects of the [request for appeal] have merit," including certain of ConocoPhillips's arguments concerning the practicability of the HDD design.[79]   The Review Officer remanded the permit decision to the Corps District Engineer for "further clarification and evaluation."[80]

---

[74] A.R. 7571 (Administrative Appeal Decision).

[75] A.R. 4801–03 (2010 ROD); A.R. 7571 (Administrative Appeal Decision).

[76] *See* A.R. 7366–7403 (4/2/10 Request for Appeal).

[77] A.R. 7379 (4/2/10 Request for Appeal) (quoting 33 C.F.R. § 331.9(b)).

[78] A.R. 7379 (4/2/10 Request for Appeal).

[79] *See* A.R. 7570, 7578–79 (Administrative Appeal Decision).

[80] A.R. 7590–91 (Administrative Appeal Decision).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 16 of 58

*iv.    2011 Record of Decision.*

Following the administrative remand, ConocoPhillips and other interested parties provided the Corps with considerable amounts of additional information on both the bridge and HDD alternatives.[81]  ConocoPhillips also agreed to certain modifications to its 2009 proposal "to further minimize project impacts in the [Colville River Delta]" in order to address concerns raised by EPA and U.S. Fish & Wildlife Service ("USFWS").[82] These modifications included narrowing the road and bridge widths and adding a fourth bridge that would allow for the flow of flood waters.[83]  The modifications reduced the total amount of fill from 62.1 acres to 58.5 acres.[84]

In December 2011, the Corps issued a Record of Decision ("2011 ROD") granting ConocoPhillips's 2009 permit application as modified.  The Corps found, based on the additional information submitted following the administrative remand, that ConocoPhillips's bridge proposal as modified was the LEDPA, instead of the HDD approach.[85]  With respect to NEPA, the Corps adopted the 2004 Alpine Satellites EIS.[86] The Corps concluded that an SEIS was not needed to evaluate ConocoPhillips's revised permit application because "there have not been substantial changes in the

---

[81] *See* A.R. 6773–76 (2011 ROD).  Following the remand, over 2,000 pages were added to the administrative record.  *See* A.R. 4883–6762, 10058–10374.

[82] A.R. 6782 (2011 ROD).

[83] A.R. 6781–82 (2011 ROD).

[84] *See* A.R. 6782 (2011 ROD).

[85] A.R. 6773–76, 6902 (2011 ROD).

[86] A.R. 6773 (2011 ROD).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 17 of 58

proposed action that are relevant to environmental concerns; and . . . there are not significant new circumstances or information relevant to environmental concerns and bearing on the proposal or impacts."[87]   The 2011 ROD that issued the Section 404 permit is the final agency action.[88]

## III.   Procedural History.

On February 27, 2013, the Kunaknana Plaintiffs filed their lawsuit challenging the Corps' decision to issue ConocoPhillips the Section 404 permit for CD-5.[89]   A few months later, on June 5, 2013, CBD filed its lawsuit.[90]   The Court permitted ConocoPhillips, Kuukpik, ASRC, the North Slope Borough, and the State of Alaska to join both actions as Intervenor-Defendants in support of the Corps.[91]   Each Intervenor-Defendant has a stake in the CD-5 project:

- Kuukpik owns the surface estate at the proposed CD-5 location and is the village corporation for Nuiqsut;[92]

- "ASRC holds the subsurface estate in the area of the proposed 'CD-5' production pad, and anticipates receiving production royalties once oil production from that project begins;"[93]

---

[87] A.R. 6899 (2011 ROD).

[88] *See* 33 C.F.R. § 331.10(b) ("If [the Corps] determines that [an administrative] appeal has merit, the final Corps decision is the district engineer's decision made pursuant to the . . . remand of the appealed action.").

[89] Docket 1 (Kunaknana Pls.' Compl.).

[90] Docket 1, Case No. 3:13-cv-00095 (CBD Compl.).

[91] *See supra* note 4.

[92] Docket 141 at 3–4 (Kuukpik Opp'n) (citing Docket 47 at 1–3 ¶¶ 1–2, 5 (Chinn Decl. in Supp. of Kuukpik Mot. to Intervene)); *cf.* supra notes 5, 61 and accompanying text (discussing Kuukpik).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 18 of 58

- The North Slope Borough "is the recognized unit of local government spanning the North Slope of Alaska;"[94] and

- The State of Alaska receives taxes and royalties on oil and gas production and actively participated in the CD-5 permitting process.[95]

On August 14, 2013, the Court issued an Order Establishing Joint Case Management and a Case Schedule, which provided for the joint management of the Kunaknana Plaintiffs' and CBD's actions and set a briefing schedule.[96] On September 4, 2013, the Court issued an order modifying the briefing schedule.[97] Pursuant to this modified schedule, the parties have filed cross-motions for summary judgment.[98] Additionally, ConocoPhillips filed a motion to strike certain extra-record exhibits attached to the Plaintiffs' summary judgment motions.[99]

---

[93] Docket 140 at 3 (ASRC Opp'n) (citing Docket 21 at 2 ¶ 4 (Imm. Decl. in Supp. of ASRC Mot. to Intervene)).

[94] Docket 141 at 3 (North Slope Borough Opp'n); *see also* Docket 64 at 3–6 (Mem. in Supp. of North Slope Borough Mot. to Intervene).

[95] Docket 27 at 4–5 (Mem. in Supp. of State of Alaska Mot. to Intervene); Docket 142 at 7–10 (State of Alaska Opp'n).

[96] Docket 86 at 1–4 (Order Establishing Joint Case Mgt.).

[97] Docket 96 at 2 (Order Granting Defs. Mot. for Extension of Time & Modifying Case Schedule).

[98] *See supra* notes 8–11 and accompanying text.

[99] Docket 126 at 5 (ConocoPhillips Mot. to Strike). The motion has been fully briefed. *See* Docket 137 (Kunaknana Pls.' Opp'n to Mot. to Strike); Docket 139 (CBD Opp'n to Mot. to Strike); Docket 145 (ConocoPhillips Reply re Mot. to Strike). Additionally, Intervenor-Defendants ASRC, State of Alaska, and Kuukpik joined in ConocoPhillips's motion to strike at Dockets 132, 133, and 134, respectively.

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 19 of 58

On February 5, 2014, after the motions had been fully briefed, the Kunaknana Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction.[100] On March 12, 2014, this Court issued an Order denying the motion with respect to the construction activities already underway at CD-5, based on the Court's determination that the balance of the equities was then tipped sharply in favor of ConocoPhillips and the other Intervenor-Defendants and that a preliminary injunction would not be in the public interest.[101] The March 2014 Order did not address the Kunaknana Plaintiffs' likelihood of success on the merits.[102]

## DISCUSSION

I.  **Jurisdiction.**

  A. *Subject Matter Jurisdiction.*

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

  B. *Article III Standing.*

Under Article III of the Constitution, "[t]he jurisdiction of the federal courts is limited to 'cases' and 'controversies.'"[103] Federal courts enforce this jurisdictional

---

[100] Docket 149 (Mot. for TRO & Prelim. Inj.).

[101] Docket 174 at 9 (Order Denying Pls.' Mot. for TRO & Prelim. Inj.) ("[E]ven assuming Plaintiffs have shown likely success on the merits and likely irreparable harm for purposes of this motion, the balance of the equities tips so far in favor of ConocoPhillips and the other Intervenor-Defendants at this time that a preliminary injunction halting this season's construction activities is not warranted, nor would it be in the public interest.").

[102] Docket 174 at 7 (Order Denying Pls.' Mot. for TRO & Prelim. Inj.).

[103] *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1138 (9th Cir. 2013) (quoting U.S. Const. art. III, § 2).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 20 of 58

limitation through the doctrine of "Article III standing."[104]   The Supreme Court

enumerated the requirements for Article III standing in *Friends of the Earth, Inc. v.*

*Laidlaw Environmental Services (TOC), Inc.*:

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it
> has suffered an "injury in fact" that is (a) concrete and particularized and
> (b) actual or imminent, not conjectural or hypothetical; (2) the injury is
> fairly traceable to the challenged action of the defendant; and (3) it is
> likely, as opposed to merely speculative, that the injury will be redressed
> by a favorable decision.[105]

The Court explained that in environmental cases, "[t]he relevant showing for purposes

of Article III standing . . . is not injury to the environment but injury to the plaintiff."[106]

Thus, "environmental plaintiffs adequately allege injury in fact when they aver that they

use the affected area and are persons 'for whom the aesthetic and recreational values

of the area will be lessened' by the challenged activity."[107]

---

[104] *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 340–42 (2006).

[105] *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  In addition to Article III standing, the Supreme Court has recognized the concept of "prudential standing, which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'"  *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11–12 (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)).  The Plaintiffs' prudential standing is not an issue in this litigation.

[106] *Friends of the Earth, Inc.*, 528 U.S. at 181.

[107] *Id.* at 183 (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)); *see also Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000) ("[A]n individual can establish 'injury in fact' by showing a connection to the area of concern sufficient to make credible the contention that the person's future life will be less enjoyable—that he or she really has or will suffer in his or her degree of aesthetic or recreational satisfaction—if the area in question remains or becomes environmentally degraded.").

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 21 of 58

Plaintiffs bear the burden of establishing their standing to bring suit,[108] and they "must demonstrate standing for each claim [they] seek[] to press."[109] At the summary judgment stage, plaintiffs "must 'set forth' by affidavit or other evidence 'specific facts,' which for purposes of the summary judgment motion will be taken to be true," that demonstrate plaintiffs satisfy the three requirements for Article III standing.[110]

   i.   *Center for Biological Diversity.*

CBD filed its lawsuit on behalf of its members.[111] The Supreme Court explained the requirements for organizational standing in *Friends of the Earth*:

> An association has standing to bring suit on behalf its members when [1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.[112]

In CBD's case, only the first prong of this test is at issue. To demonstrate that at least one of its members would have standing to sue in his or her own right, CBD included as exhibits to its summary judgment motion the declarations of three of its members—Marybeth Holleman, Rick Steiner, and Jack Lentfer.[113] In its briefing, CBD

---

[108] *See Lujan*, 504 U.S. at 561.

[109] *DaimlerChrysler*, 547 U.S. at 352.

[110] *Lujan*, 504 U.S. at 561 (citation omitted) (citing Fed. R. Civ. P. 56(e)).

[111] *See* Docket 1 at 3–9 ¶¶ 6–23, Case No. 3:13-cv-00095 (CBD Compl.).

[112] *Friends of the Earth*, 528 U.S. at 181 (citing *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)).

[113] *See* Docket 106-1 (Ex. 1 to CBD Mot. for Summ. J.: Holleman Decl.); Docket 106-2 (Ex. 2 to CBD Mot. for Summ. J.: Lentfer Decl.); Docket 106-3 (Ex. 3 to CBD Mot. for Summ. J.: Steiner Decl.); *see also* Docket 106 at 21 (CBD Mot. for Summ. J.) ("Jack Lentfer, Marybeth Holleman

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 22 of 58

asserts that these members "have all dedicated extensive time and energy studying, recreating, and traveling in Arctic Alaska, and each plans to return to enjoy the scenery and wildlife of the Colville River Delta in the near future."[114]  It further asserts that "[t]he CD-5 project poses an imminent threat of injury to each member's interest in enjoying the recreational and aesthetic value of the area."[115]  But to determine whether CBD has standing, the Court looks to the members' declarations, not to counsel's assertions.

In her declaration, Marybeth Holleman states that she lives in Anchorage, Alaska.[116]  She states that in the past, she has "traveled to and written about Alaska's Arctic and its wildlife."[117]  She traveled to Prudhoe Bay in 1988, Unalakleet in 1990, St. Lawrence Island in 1995, and Barrow and Kaktovik in 2009.[118]  On her trip to Barrow and Kaktovik, Ms. Holleman "flew over the Colville Delta."[119]  She states: "Since the Kaktovik trip, I have been wanting to return.  Primarily, I plan to do some river trips in the Arctic. . . .  The Colville River is one [my spouse and I] are seriously considering in the next couple of years."[120]  She also states:

---

and Rick Steiner each have individual standing because the construction of CD-5 will cause them to suffer a concrete and particularized injury.").

[114] Docket 106 at 21 (CBD Mot. for Summ. J.).

[115] Docket 106 at 22 (CBD Mot. for Summ. J.).

[116] Docket 106-1 at 2 (Ex. 1 to CBD Mot. for Summ. J.: Holleman Decl.).

[117] Docket 106-1 at 2 (Ex. 1 to CBD Mot. for Summ. J.: Holleman Decl.).

[118] Docket 106-1 at 2–3 (Ex. 1 to CBD Mot. for Summ. J.: Holleman Decl.).

[119] Docket 106-1 at 3 (Ex. 1 to CBD Mot. for Summ. J.: Holleman Decl.).

[120] Docket 106-1 at 4 (Ex. 1 to CBD Mot. for Summ. J.: Holleman Decl.).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 23 of 58

I am worried that the currently proposed CD-5 project poses the risk of an oil spill into the Colville River, which could flow into the Arctic Ocean. If there were to be an oil spill, my interests in floating the Colville River, and, more broadly, in viewing and appreciating the wildlife of the Colville Delta and the Arctic Ocean, would be harmed.[121]

In his declaration, Richard Steiner states that he lives in Anchorage, Alaska.[122] He states that he has traveled extensively throughout Arctic Alaska. He describes his travels as including flying "over the upper reaches of the Colville River."[123] He states: "I have been both west and east of the Colville Delta, and have flown over the entire Delta from Barrow to Prudhoe Bay."[124] Additionally, he states: "I have always hoped to float the Colville River, and am hoping to arrange a float in the next couple of years."[125] He concludes: "If there were to be an oil spill into the Colville River, it would harm my interests in seeing and enjoying the Colville Delta and the species that inhabit it."[126]

In his declaration, Jack Lentfer states that he lives in Homer, Alaska and is "retired from working as a wildlife biologist in Alaska for over 46 years."[127] In 1964 and 1965, he worked in the Colville River Delta as an employee for the Alaska Department of Fish & Game.[128] In October 1964, he stayed with a family that lived "approximately

---

[121] Docket 106-1 at 5 (Ex. 1 to CBD Mot. for Summ. J.: Holleman Decl.).

[122] Docket 106-3 at 2 (Ex. 3 to CBD Mot. for Summ. J.: Steiner Decl.).

[123] Docket 106-3 at 3 (Ex. 3 to CBD Mot. for Summ. J.: Steiner Decl.).

[124] Docket 106-3 at 3–4 (Ex. 3 to CBD Mot. for Summ. J.: Steiner Decl.).

[125] Docket 106-3 at 5 (Ex. 3 to CBD Mot. for Summ. J.: Steiner Decl.).

[126] Docket 106-3 at 6 (Ex. 3 to CBD Mot. for Summ. J.: Steiner Decl.).

[127] Docket 106-2 at 1 (Ex. 2 to CBD Mot. for Summ. J.: Lentfer Decl.).

[128] Docket 106-2 at 2 (Ex. 2 to CBD Mot. for Summ. J.: Lentfer Decl.).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 24 of 58

13 miles down-river from the CD-5 pad and Nigliq crossing." From 1969 to 1977, Mr. Lentfer "made numerous trips as a state and federal employee throughout the North Slope, including the Colville River delta and surrounding area within the NPR-A."[129] He also made visits to Nuiqsut during that time, and his daughter did a week-long exchange with a Nuiqsut family in 1976.[130] He states: "After retiring, I have continued to visit the Arctic and specifically the vicinity of CD-5 on recreational trips. I flew into the upper Colville River area with my wife in the spring of 1995 and camped for about ten days in an outstanding location for observing wildlife in an undisturbed setting."[131] He also describes trips to other places in the Arctic in 1999, 2003, and 2007.[132] He states: "I still have a strong interest in the Arctic coast of northeast Alaska, including the lower Colville River . . . . I plan to maintain these interests and to continue to travel to Arctic coastal areas."[133] He adds that "the presence of oil drilling facilities . . . in the Colville delta would greatly diminish my enjoyment and appreciation of the area and thus would probably cause me not to return there."[134]

ConocoPhillips asserts that none of these declarations demonstrates past use of the CD-5 project area "accompanied by credible evidence of planned future use," and, therefore, "CBD has failed to demonstrate an injury [in] fact and its case must be

---

[129] Docket 106-2 at 2 (Ex. 2 to CBD Mot. for Summ. J.: Lentfer Decl.).

[130] Docket 106-2 at 2, 4 (Ex. 2 to CBD Mot. for Summ. J.: Lentfer Decl.).

[131] Docket 106-2 at 3 (Ex. 2 to CBD Mot. for Summ. J.: Lentfer Decl.).

[132] Docket 106-2 at 3–4 (Ex. 2 to CBD Mot. for Summ. J.: Lentfer Decl.).

[133] Docket 106-2 at 4 (Ex. 2 to CBD Mot. for Summ. J.: Lentfer Decl.).

[134] Docket 106-2 at 4–5 (Ex. 2 to CBD Mot. for Summ. J.: Lentfer Decl.).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 25 of 58

dismissed" for lack of standing.[135]  In support of this argument, ConocoPhillips cites *Lujan v. Defenders of Wildlife* and *Wilderness Society, Inc. v. Rey*.[136]  The other Intervenor-Defendants join in ConocoPhillips's argument concerning CBD's lack of standing.[137]

In *Lujan*, plaintiffs Defenders of Wildlife and other environmental organizations ("Defenders") filed suit against the Secretary of the Interior to challenge a regulation interpreting Section 7(a)(2) of the Endangered Species Act ("ESA").  The challenged regulation limited the requirement that federal agencies consult with the Secretary of the Interior to ensure their actions do not jeopardize endangered species to apply only to "actions taken in the United States or on the high seas" and not to actions taken in foreign nations.[138]  To support its assertion that it had standing to object to this limitation, Defenders submitted the affidavits of two of its members.  One member averred that she had visited Egypt in 1986 to observe the habitat of the endangered Nile crocodile; that she "intend[s] to do so again, and hope[s] to observe the crocodile directly"; and that she will suffer harm if ESA Section 7(a)(2) is not applied to the American role in overseeing the rehabilitation of the Aswan Dam.[139]  The second member averred that she had visited Sri Lanka in 1981 to observe the habitat of certain

---

[135] Docket 129 at 25–26 (ConocoPhillips Opp'n).

[136] Docket 129 at 20–21 (ConocoPhillips Opp'n).

[137] *See* Docket 140 at 10 (ASRC Opp'n); Docket 141 at 11 (Kuukpik Opp'n); Docket 142 at 26 (State of Alaska Opp'n); Docket 143 at 5 (North Slope Borough Opp'n).

[138] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 557–59 (1992).

[139] *See id.* at 563.

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 26 of 58

endangered species; that she "intend[s] to return to Sri Lanka in the future and hope[s] to be more fortunate in spotting at least the endangered elephant and leopard"; and that she will suffer harm if ESA Section 7(a)(2) is not applied to the Mahaweli project funded by the U.S. Agency for International Development.[140]

The Supreme Court held Defenders lacked standing because the affidavits contained no facts demonstrating that its members were likely to suffer actual or imminent injury.[141] The Court explained:

> That the women "had visited" the areas of the projects before the projects commenced proves nothing. . . . And the affiants' profession of an "inten[t]" to return to the places they had visited before—where they will presumably, this time, be deprived of the opportunity to observe animals of the endangered species—is simply not enough. Such "some day" intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the "actual or imminent" injury that our cases require.[142]

The Court also rejected Defenders' argument that "any person who uses *any part* of a 'contiguous ecosystem' adversely affected by a funded activity has standing even if the activity is located a great distance away."[143] The Court explained that "a plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it."[144] The Court also rejected Defenders' argument that a person with a personal or professional interest in

---

[140] *See id.*

[141] *Id.* at 564, 578.

[142] *Id.* at 564 (alteration in original).

[143] *Id.* at 565 (emphasis in original).

[144] *Id.* at 565–66 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 887–89 (1990)).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 27 of 58

an animal species can suffer an injury in fact sufficient to form the basis for standing as a result of a "single project affecting some portion of that species with which [the person] has no more specific connection."[145]

The Ninth Circuit reached a similar conclusion in *Wilderness Society, Inc. v. Rey*.[146] In that case, The Wilderness Society and other environmental organizations ("TWS") challenged Forest Service regulations "limit[ing] the scope and availability of notice, comment, and appeals procedures."[147] TWS asserted that it had associational standing by virtue of one of its members' "recreational and aesthetic injuries."[148] The member submitted a declaration stating that he had used Oregon's Umpqua National Forest in the past, that the "Ash Creek Fire Salvage Project" threatened the ecological integrity of that forest, and that the project would have been subject to appeal under prior regulations.[149] The member also expressed a general intent to return to the Umpqua National Forest and to other national forests in Washington and Oregon.[150]

The Ninth Circuit held that the member's declaration was "insufficient to support standing."[151] The court explained that the member's "'some day' general intention to return to the national forests of two geographically large states is too vague to confer

---

[145] *Id.* at 567.

[146] 622 F.3d 1251 (9th Cir. 2010).

[147] *Id.* at 1253.

[148] *Id.* at 1255–56.

[149] *Id.* at 1256.

[150] *Id.*

[151] *Id.* at 1257.

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 28 of 58

standing because [he] has not shown that he is likely to encounter an *affected* area of the Umpqua National Forest in his future visits."[152]

Here, the Court agrees with ConocoPhillips that under *Lujan* and *Wilderness Society*, CBD's members have not demonstrated the requisite injury in fact necessary to confer standing on CBD. As ConocoPhillips points out, neither Ms. Holleman nor Mr. Steiner claims to have ever visited the CD-5 project area.[153] The closest either has come is flying over the Colville River and/or the Colville River Delta.[154] Moreover, neither has testified about a concrete plan to visit the project area in the future. Rather, Ms. Holleman states only that she is "seriously considering" floating the Colville River in the next couple of years,[155] and Mr. Steiner states that he is "hoping" to arrange a float of the Colville River in the next couple of years.[156] As in *Lujan*, these "some day" intentions are insufficient to confer standing, particularly when it is unclear whether these hypothetical float trips would bring Ms. Holleman or Mr. Steiner to the CD-5 project area.

Mr. Lentfer's declaration establishes that he has traveled extensively in the Colville River Delta in the past. However, it appears the closest he ever came to the

---

[152] *Id.* at 1256.

[153] Docket 129 at 22–24 (ConocoPhillips Opp'n).

[154] *See* Docket 106-1 (Ex. 1 to CBD Mot. for Summ. J.: Holleman Decl.); Docket 106-3 (Ex. 3. to CBD Mot. for Summ. J.: Steiner Decl.); *cf.* Docket 130 (DeGeorge Decl. in Supp. of ConocoPhillips Opp'n) (listing distances of various places visited by CBD's members from the CD-5 project area).

[155] Docket 106-1 at 4 (Ex. 1 to CBD Mot. for Summ. J.: Holleman Decl.).

[156] Docket 106-3 at 5 (Ex. 3 to CBD Mot. for Summ. J.: Steiner Decl.).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 29 of 58

CD-5 project area was in 1964, when he stayed with a family that lived 13 miles downstream from the CD-5 pad and Nigliq crossing.[157]  Additionally, Mr. Lentfer has not demonstrated an intent to return to any part of the Colville River Delta, much less the CD-5 project area.  The most he says is that he has unspecified plans "to continue to travel to Arctic coastal areas."[158]  This is insufficient to establish standing to challenge the CD-5 project.

> In its reply brief, CBD responds to the lack-of-standing argument by asserting:
>
> The area in which CD-5 will be built is only a small part of the area affected by the Corps' decision.  One of the Center's primary concerns is that the Corps' decision to permit an above-ground pipeline and bridge increases the risk of a catastrophic oil spill into the Colville River, which would be carried downstream into the Arctic Ocean.  Thus, the Center's declarants recreational and aesthetic use and enjoyment of the greater Colville River Delta and Arctic Ocean go directly to the heart of the injury; when the zone of impact is widespread, so too are the injuries.[159]

Thus, CBD attempts to characterize the CD-5 project as affecting a very large geographic area, such that its members' connections to Arctic Alaska are sufficient to confer standing.  However, CBD has cited no authority for the proposition that an environmental plaintiff's standing can be based on connections to the area that could potentially be affected by an agency decision, i.e., in the event of some catastrophe

---

[157] *See* Docket 106-2 (Ex. 2 to CBD Mot. for Summ. J.: Lentfer Decl.); *cf.* Docket 130 (DeGeorge Decl. in Supp. of ConocoPhillips Opp'n) (listing distances of various places visited by CBD's members from the CD-5 project area).

[158] Docket 106-2 at 4 (Ex. 2 to CBD Mot. for Summ. J.: Lentfer Decl.).

[159] Docket 147 at 6 (CBD Reply) (citation omitted); *see also* Docket 147 at 4 ("Each of the Center's declarants has visited the zone of impact of the CD-5 project—the Colville River Delta and adjacent Arctic Ocean . . . .").

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 30 of 58

such as an oil spill, as opposed to the area that will with certainty be affected.[160] Rather, both *Lujan* and *Wilderness Society* make clear that an environmental plaintiff cannot base standing on a connection to the broader ecosystem within which a project takes place.[161]

CBD also asserts that "the Center's declarants' interests in affected species . . . bear directly on the question of injury in fact, regardless of whether the declarants have viewed those species in the construction area or whether they have viewed those same animals in other areas affected by the project."[162]   However, the Supreme Court unequivocally held in *Lujan* that a plaintiff's interest in an animal species is insufficient to confer standing to challenge a "single project affecting some portion of that species with which [the plaintiff] has no more specific connection."[163]

---

[160] To support its assertion that the "zone of impact" of the CD-5 project is widespread, CBD cites *Defenders of Wildlife v. EPA*, 420 F.3d 946 (9th Cir. 2005), which was reversed for reasons unrelated to standing in *National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007).  *Defenders of Wildlife v. EPA* involved a challenge under ESA to EPA's decision to transfer responsibility for CWA permitting to the State of Arizona.  *Defenders*, 420 F.3d at 949–50.  To establish standing, plaintiff Defenders of Wildlife submitted affidavits of Defenders' members who resided in Arizona and photographed and observed endangered species in various habitats throughout the state.  *Id.* at 956–58.  One intervenor-defendant argued that these allegations of harm throughout the state did not establish standing "because the state encompasses too large an area to permit a sufficiently specific injury-in-fact allegation."  *Id.* at 957.  The court rejected this argument, explaining: "[I]n light of the statewide impact of EPA's transfer decision, alleging an injury-in-fact covering large areas within the state simply reflects the relatively broad nature of the potential harm."  *Id.*  In contrast to *Defenders*, this litigation involves a challenge to an agency decision to permit a single development project, not an agency action affecting an entire state.  Accordingly, *Defenders* does not support CBD's position.

[161] *See supra* text accompanying notes 143–44, 152.

[162] Docket 147 at 6 (CBD Reply).

[163] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 567 (1992).  CBD cites several cases to support its assertion that its members' standing can be based on an interest in Arctic species.  *See* Docket 147 at 4 (CBD Reply).  However, these cases all involved challenges to agency

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 31 of 58

This litigation involves a challenge to an agency decision permitting a single project with a 58.5-acre footprint.[164]  58.5 acres is a small fraction of the size of the Colville River Delta and an even smaller fraction of Arctic Alaska.[165]  Based upon the nature of this project and the controlling precedent of the Supreme Court and the Ninth Circuit with respect to standing, the CBD declarants' connections to Arctic Alaska and to Arctic species are insufficient "to make credible the contention that [their] future life will be less enjoyable—that [they] really ha[ve] or will suffer in [their] degree of aesthetic or recreational satisfaction" if CD-5 is developed.[166]  CBD therefore lacks Article III standing, and its action will be dismissed.

---

regulations or programs covering very large geographic areas.  *See Ctr. for Biological Diversity v. Kempthorne*, 588 F.3d 701, 705, 707–08 (9th Cir. 2009) (holding plaintiffs who viewed polar bears and walruses in Beaufort Sea region and had plans to do so in future had standing to challenge USFWS regulation authorizing non-lethal "take" of polar bears and walruses by oil and gas activities in that region); *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 471, 479 (D.C. Cir. 2009) (holding plaintiffs with interest in animals living in Outer Continental Shelf area of Beaufort, Bering, and Chukchi Seas who detailed "definitive dates" for traveling to view such animals in future had standing to challenge Department of Interior's expansion of oil and gas leasing program in that area); *Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332, 1337–41 (9th Cir. 1992) (holding Alaska plaintiffs who observed and enjoyed Alaska sea otters had standing on appeal to challenge trial court judgment striking down regulation prohibiting Alaska Natives from taking sea otters in order to make handicrafts and clothing).

[164] *See* A.R. 6782 (2011 ROD).

[165] 58.5 acres is approximately 0.0016 square miles.  The Colville River Delta is approximately 250 square miles in size.  A.R. 7490 (8/12/10 ConocoPhillips's Response to Review Officer's Questions).  Arctic Alaska is approximately 216,000 square miles in size.  Docket 130 at 3 ¶ 12 (DeGeorge Decl. in Supp. of ConocoPhillips Opp'n).

[166] *See Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1149 (9th Cir. 2000).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 32 of 58

ii.    *Kunaknana Plaintiffs.*

The Kunaknana Plaintiffs are individuals who live in Nuiqsut,[167] which is approximately eight miles south of the Alpine Central Processing Facility at CD-1.[168] In declarations submitted with their motion for summary judgment, the Kunaknana Plaintiffs state that they conduct subsistence activities in the vicinity of the CD-5 project.[169] They assert that "[t]he CD-5 project will directly harm [their] aesthetic, spiritual, cultural, religious, and recreational enjoyment of the CD-5 area," and that full compliance with the CWA and NEPA may result in a project "that will have less of an impact on the rich and productive subsistence areas [they] rely on near the CD-5 project."[170] The Kunaknana Plaintiffs' declarations demonstrate an injury in fact traceable to the Corps' actions and redressable by a favorable court decision, such that the Kunaknana Plaintiffs have Article III standing.[171]

---

[167] *See* Docket 110 at 1 ¶ 2 (Kunaknana Decl.); Docket 111 at 1 ¶ 2 (Itta Decl.); Docket 112 at 1 ¶ 2 (Nukapigak Decl.); Docket 113 at 1 ¶ 2 (Ahnupkana Decl.); Docket 114 at 1 ¶ 2 (Nicholls Decl.).

[168] A.R. 451 (2004 Alpine Satellites EIS); Docket 47 at 2 ¶¶ 2–3 (Chinn Decl. in Supp. of Kuukpik Mot. to Intervene); *cf. supra* notes 35–38 and accompanying text (discussing Nuiqsut).

[169] *See* Docket 110 (Kunaknana Decl.); Docket 111 (Itta Decl.); Docket 112 (Nukapigak Decl.); Docket 113 (Ahnupkana Decl.); Docket 114 (Nicholls Decl.); *see also* Docket 129 at 28 (ConocoPhillips Opp'n) (stating Kunaknana Plaintiffs' declarations show "actual and repeated use of the area affected by the project for recreational, aesthetic, subsistence and religious purposes").

[170] Docket 110 at 3 ¶¶ 10, 12 (Kunaknana Decl.); Docket 111 at 3 ¶¶ 10–11 (Itta Decl.); Docket 112 at 3 ¶¶ 10–11 (Nukapigak Decl.); Docket 113 at 2–3 ¶¶ 10–11 (Ahnupkana Decl.); Docket 114 at 3 ¶¶ 10–11 (Nicholls Decl.).

[171] ConocoPhillips asserts that "[t]he decision in *Wildearth Guardians v. Salazar* demonstrates that the [Kunaknana] [P]laintiffs lack standing with respect to their NEPA arguments based on climate change impacts." Docket 129 at 29 (ConocoPhillips Opp'n). However, as the Kunaknana Plaintiffs correctly point out in their reply, the decision in *Wildearth* is inapposite. *See* Docket 146 at 28–29 (Kunaknana Pls.' Reply). In that case, plaintiff environmental

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 33 of 58

## II. Standard of Review of Agency Action.

The Kunaknana Plaintiffs assert that the Corps' issuance of the wetlands permit for the CD-5 project violated NEPA and Section 404 of the CWA. They seek judicial review of the Corps' decision under the Administrative Procedure Act ("APA"),[172] which provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[173] The APA directs courts to "hold unlawful and set

---

organizations argued that BLM failed to prepare an adequate EIS before leasing certain public lands for coal mining operations. *Wildearth Guardians v. Salazar*, 880 F. Supp. 2d 77, 80, 82 (D.D.C. 2012). They asserted, among other things, that their interest in the lands would be harmed by climate change impacts that would result from greenhouse gas emissions caused by the coal mining. *Id.* at 83. The court held plaintiffs lacked standing to pursue this climate change claim because the "causal chain . . . is ultimately too attenuated." *Id.* at 86. In this case, by contrast, the Kunaknana Plaintiffs do not allege that they will be harmed by climate change impacts caused by the CD-5 project. *See* Docket 146 at 28 (Kunaknana Pls.' Reply) ("Causation pertaining to climate change impacts from projects that emit greenhouse gases is not at issue in this case"). Rather, they assert that the Corps failed to consider and evaluate post-2004 information concerning climate change that could affect the environmental impact of the CD-5 project. *See* Docket 108 at 43–46 (Kunaknana Pls.' Mot. for Summ. J.); Docket 146 at 27–32 (Kunaknana Pls.' Reply). The Kunaknana Plaintiffs have Article III standing to bring this claim.

[172] *See* Docket 107 at 2 (Kunaknana Pls.' Mot. for Summ. J.).

[173] 5 U.S.C. § 702; *see also Wilderness Soc'y v. U.S. Fish & Wildlife Serv.*, 353 F.3d 1051, 1059 (9th Cir. 2003) (en banc) ("The Administrative Procedure Act ('APA') governs judicial review of agency action."). A plaintiff bringing suit under the APA must meet the APA's standing requirements in addition to the Article III standing requirements. "[T]he APA's standing requirements [are] that there be (1) a final agency action; and (2) that the plaintiff suffers an injury that falls within the 'zone of interests' of the violated statutory provision." *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1087 (9th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–83 (1990)). In this case, it appears undisputed that the 2011 ROD is a final agency action and that the Kunaknana Plaintiffs' alleged injuries fall within the "zone of interests" sought to be protected by the CWA and NEPA.

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 34 of 58

aside" an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[174]

The Supreme Court has held that "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."[175] And the Ninth Circuit has "emphasized that deference to the agency's decisions is especially warranted when reviewing the agency's technical analysis and judgments, based on an evaluation of complex scientific data within the agency's technical expertise."[176] "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[177]

"In conducting [its] review, [a court] may look only to the administrative record to determine whether the agency has articulated a rational basis for its decision."[178] The court must consider, based on the record, whether the agency's decision "was based on a consideration of the relevant factors and whether there has been a clear error of judgment."[179] The court may "uphold a decision of less than ideal clarity if the agency's

---

[174] 5 U.S.C. § 706(2)(A).

[175] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[176] *Native Village of Point Hope v. Salazar*, 680 F.3d 1123, 1130 (9th Cir. 2012) (internal quotation marks omitted).

[177] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

[178] *Arrington v. Daniels*, 516 F.3d 1106, 1113 (9th Cir. 2008).

[179] *Nw. Coal. for Alternatives to Pesticides (NCAP) v. EPA*, 544 F.3d 1043, 1048 (9th Cir. 2008) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 35 of 58

path may be reasonably discerned."[180]  But "when an agency fails to provide an explanation for its actions [the court is] left with no means of reviewing the reasonableness of that action."[181]  Therefore, an "agency's lack of explanation for its choice renders its decision arbitrary and capricious."[182]

## III.    Kunaknana Plaintiffs' Failure to Participate in the CD-5 Permitting Process.

ConocoPhillips asserts that the Kunaknana Plaintiffs' claims should be dismissed because they did not participate in the CD-5 permitting process before the agency.[183] The other Intervenor-Defendants join in ConocoPhillips's argument.[184]  The Kunaknana Plaintiffs do not dispute that they did not participate in the permitting process,[185] but they maintain that the Court can hear their claims because they were not required to submit comments to the agency and because the Corps "was aware of and had the opportunity to address all of the issues identified in this lawsuit."[186]

---

[180] *Id.* (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

[181] *Arrington*, 516 F.3d at 1114.

[182] *Id.*

[183] Docket 129 at 29–30 (ConocoPhillips Opp'n).

[184] *See* Docket 140 at 10 (ASRC Opp'n); Docket 141 at 12 & n.46 (Kuukpik Opp'n); Docket 142 at 23 (State of Alaska Opp'n); Docket 143 at 5 (North Slope Borough Opp'n).

[185] In his declaration, one of the Kunaknana Plaintiffs, Sam Kunaknana, states that he "participated in a meeting regarding CD-5 held by the Corps prior to the Corps issuing its 2010 Record of Decision."  Docket 110 at 3 (Kunaknana Decl.).  However, he does not elaborate further, and the Kunaknana Plaintiffs do not discuss Mr. Kunaknana's participation in the administrative process in their briefing.

[186] Docket 146 at 10 (Kunaknana Pls.' Reply).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 36 of 58

The Ninth Circuit "has declined to adopt 'a broad rule which would require participation in agency proceedings as a condition precedent to seeking judicial review of an agency decision.'"[187]  However, the Ninth Circuit has also stated that absent exceptional circumstances, it will decline to consider specific issues that were not raised at all before the agency during the administrative process,[188] a requirement the Kunaknana Plaintiffs refer to as "issue exhaustion."[189]  The purpose of the issue exhaustion requirement is "to permit [the] administrative agenc[y] to utilize [its] expertise, correct any mistakes, and avoid unnecessary judicial intervention in the process."[190]  Thus, an issue can form the basis of a legal challenge to an agency action

---

[187] *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006) (quoting *Kunaknana v. Clark*, 742 F.2d 1145, 1148 (9th Cir. 1984)).  Before a party may seek judicial review of an agency action under the APA, the party must exhaust all administrative remedies prescribed by statute or agency rule.  *See Darby v. Cisneros*, 509 U.S. 137, 146–47 (1993) (interpreting 5 U.S.C. § 704).  But here, the Kunaknana Plaintiffs correctly point out that exhaustion of administrative remedies is not an issue.  "There is no . . . provision in the CWA, NEPA, or their regulations at issue in this case requiring that [the Kunaknana] Plaintiffs submit comments or exhaust any specified administrative remedies" as a prerequisite to bringing suit in federal court.  *See* Docket 146 at 15 (Kunaknana Pls.' Reply).

[188] *See, e.g.*, *Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1065 (9th Cir. 2009); *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1024 (9th Cir. 2007); *Marathon Oil Co. v. United States*, 807 F.2d 759, 767–68 (9th Cir. 1986).  The Ninth Circuit has suggested that an example of "exceptional circumstances" would be evidence of administrative bias.  *See Geo-Energy Partners-1983 Ltd. v. Salazar*, 613 F.3d 946, 959 (9th Cir. 2010).

[189] *See* Docket 146 at 10 (Kunaknana Pls.' Reply).  The Kunaknana Plaintiffs correctly point out that courts sometimes blur the distinction between exhaustion of administrative remedies and "issue exhaustion."  *See* Docket 146 at 10 n.1.  In *Portland General Electric Co. v. Bonneville Power Administration*, the Ninth Circuit stated that although the general requirement that issues first be raised before the administrative agency "has sometimes been phrased in terms of standing or exhaustion, . . . it is best characterized as waiver."  501 F.3d at 1023.  However, some subsequent Ninth Circuit decisions have continued to use the term "exhaustion."  *See, e.g., Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1065.  To maintain consistency with the briefing in this case, this Court will use the term "issue exhaustion."

[190] *Lands Council v. McNair*, 629 F.3d 1070, 1076 (9th Cir. 2010).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 37 of 58

in federal court only if that issue was first brought to the attention of the agency with clarity sufficient to allow the agency the opportunity to consider the issue and to rectify the violations alleged.[191] However, there is no requirement that the *plaintiff* be the one who raised the issue before the agency.[192]

The Supreme Court discussed issue exhaustion in the context of a NEPA claim in *Department of Transportation v. Public Citizen.*[193] In that case, the Federal Motor Carrier Safety Administration issued an environmental assessment ("EA") for its proposed rules to regulate the safety of Mexican motor carriers. The EA concluded that the rules would have no significant impact on the environment.[194] The plaintiffs filed suit, arguing the EA's analysis was flawed in part because it should have considered alternatives to the issuance of the rules.[195] However, because the plaintiffs did not raise this particular challenge to the EA during the administrative process, the Court held the plaintiffs had forfeited this objection.[196] The Court stated: "Persons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts

---

[191] *See Nat'l Parks & Conservation Ass'n*, 606 F.3d at 1065.

[192] *See Portland Gen. Elec. Co.*, 501 F.3d at 1024 ("In general, we will not invoke the waiver rule in our review of a notice-and-comment proceeding if an agency has had an opportunity to consider the issue. This is true even if the issue was considered sua sponte by the agency or was raised by someone other than the petitioning party." (citation omitted)); *see also Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971 (9th Cir. 2006) (taking into account comments submitted by parties other than plaintiffs in determining whether issue of adequacy of EIS's cumulative impact analysis was brought to attention of BLM during administrative process).

[193] 541 U.S. 752 (2004).

[194] *Id.* at 760–62.

[195] *Id.* at 762–64.

[196] *Id.* at 764–65.

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 38 of 58

the agency to the [parties'] positions and contentions,' in order to allow the agency to give the issue meaningful consideration."[197]

And yet, after articulating this holding, the Court added that "[a]dmittedly, the agency bears the primary responsibility to ensure that it complies with NEPA."[198] Although not the situation in *Department of Transportation*, the Court suggested that "an EA's or an EIS's flaws might be so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge a proposed action."[199] "[The Ninth Circuit] has interpreted the 'so obvious' standard as requiring that the agency have independent knowledge of the issues that concern petitioners."[200]

For the foregoing reasons, the fact that the Kunaknana Plaintiffs did not participate in the administrative process for CD-5 does not preclude them from maintaining this lawsuit. However, for each issue they seek to raise here, it must be clear from the record that the Corps was aware of the issue. Whether that is the case will be discussed in the next section with respect to each of the issues underlying the Kunaknana Plaintiffs' NEPA claim.

---

[197] *Id.* at 764 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 553 (1978)). Courts sometimes refer to this principle as the "*Vermont Yankee* doctrine." *See, e.g., Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1534 (9th Cir. 1997).

[198] *Dep't of Transp.*, 541 U.S. at 765.

[199] *Id.*

[200] *Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1132 (9th Cir. 2011) (citing *'Ilio'ulaokalani Coal. v. Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006)); *cf. supra* note 192 (explaining that even if plaintiff didn't raise issue before agency, plaintiff can raise issue in court so long as it appears agency was aware of issue).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 39 of 58

**IV.   Claim 1: Violation of NEPA.**

The Kunaknana Plaintiffs' first claim is that the Corps' issuance of the Section 404 permit to ConocoPhillips violated NEPA.  As discussed above, in the 2011 ROD granting ConocoPhillips a Section 404 permit for CD-5, the Corps adopted the 2004 Alpine Satellites EIS.[201]   The Kunaknana Plaintiffs' primary argument is that the Corps was required to conduct a supplemental NEPA analysis for two reasons: (1) the CD-5 project has been reconfigured since the 2004 Alpine Satellites EIS, and (2) "there is new information bearing on the environmental analysis conducted by the BLM in 2004."[202]   The Kunaknana Plaintiffs also assert that even if the Court declines to find an SEIS is required, the Corps failed to provide a reasoned explanation for its decision not to prepare an SEIS.[203]

An agency is not required to prepare an SEIS every time there are changes to a project or new information comes to light.[204]   Rather, an agency must prepare an SEIS only if there are *substantial* changes to the proposed project or if there is *significant* new information relevant to environmental concerns.[205]

---

[201] A.R. 6773 (2011 ROD).

[202] Docket 108 at 31 (Kunaknana Pls.' Mot. for Summ. J.).

[203] *See* Docket 108 at 32 (Kunaknana Pls.' Mot. for Summ. J.) ("[T]he Corps not only failed to prepare the requisite supplemental EIS or EA, it failed to even make the initial determination that there is no significant new information or that the project has not changed in such a manner to warrant additional NEPA analysis, which violates NEPA.").

[204] *See Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 854 (9th Cir. 2013); *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1157 (9th Cir. 2008) (per curiam).

[205] *See supra* note 25 (quoting 40 C.F.R. § 1502.9(c)(1)); *see also N. Idaho Cmty. Action Network*, 545 F.3d at 1157 ("[A] SEIS is required only if changes, new information, or

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 40 of 58

Whether an SEIS is required "is a classic example of a factual dispute the resolution of which implicates substantial agency expertise."[206]  Such disputes "must be resolved in favor of the expert agency *so long as the agency's decision is based on a reasoned evaluation of the relevant factors*."[207]  Thus, if an agency has decided preparation of an SEIS is not required, a reviewing court must carefully review the record and satisfy itself that the agency's decision was based on a reasoned evaluation of the significance of project changes and/or new information.[208]  But if the record does not contain a reasoned explanation for the agency's decision not to prepare an SEIS, the court should set aside the agency's decision as "arbitrary or capricious."[209]

---

circumstances may result in significant environmental impacts 'in a manner not previously evaluated and considered.'" (quoting *Westlands Water Dist. v. Dep't of Interior*, 376 F.3d 853, 873 (9th Cir. 2004))).

[206] *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376 (1989).

[207] *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 954 (9th Cir. 2003) (emphasis added).

[208] *See Marsh*, 490 F.3d at 378.  The Kunaknana Plaintiffs appear to assert that the Corps should have prepared an "environmental reevaluation" or a "supplemental information report" documenting its determination that an SEIS was unnecessary.  *See* Docket 108 at 37 (Kunaknana Pls.' Mot. for Summ. J.) ("[T]he Corps never prepared an 'environmental reevaluation' or other similar document (*e.g.*, a supplemental information report) to determine if a supplemental NEPA review was required.").  However, the Corps correctly points out that "an agency must only 'make a reasoned decision documented in the record' . . . .  No specific form of documentation is required."  Docket 131 at 32 (Corps Opp'n) (quoting *Great Old Broads for Wilderness*, 709 F.3d at 855); *see also Price Road Neighborhood Ass'n, Inc. v. U.S. Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997) (noting neither NEPA nor CEQ regulations discuss how agencies should make determination whether SEIS is required); *Natural Res. Def. Council, Inc. v. Evans*, 232 F. Supp. 2d 1003, 1043–44 (N.D. Cal. 2002) (affirming agency's decision not to prepare SEIS based on agency's satisfactory explanation for that decision in a ROD).

[209] *See Marsh*, 490 F.3d at 376–78, 385; *supra* Discussion Part II (explaining APA standard of review).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 41 of 58

These concepts were applied by the Ninth Circuit in *Friends of the Clearwater v. Dombeck*.[210] There, Friends of the Clearwater and other environmental groups ("FOC") challenged the Forest Service's denial of their demand that it prepare an SEIS to address, among other things, seven new sensitive species designations that had occurred in the nine years since the Forest Service completed the original EIS.[211] The district court held that data in the original EIS supported Forest Service's decision not to prepare an SEIS and granted summary judgment to the Forest Service.[212] On appeal, FOC argued that the Forest Service failed "sufficiently to consider and evaluate the need for[] an SEIS in light of the seven new sensitive species designations."[213]

The Ninth Circuit agreed with FOC, explaining:

> There is no evidence in the record that, before the inception of this action, the Forest Service ever considered whether the seven new sensitive species designations . . . were sufficiently significant to require preparation of an SEIS. When confronted with this important new information, it was incumbent on the Forest Service to evaluate the existing EIS to determine whether it required supplementation.[214]

The Ninth Circuit held "that the Forest Service's failure to evaluate in a timely manner the need to supplement the original EIS in light of that new information violated NEPA."[215]

---

[210] 222 F.3d 552 (9th Cir. 2000).

[211] *Id.* at 555–56.

[212] *Id.* at 556.

[213] *Id.* at 558.

[214] *Id.* at 559.

[215] *Id.*; *cf. also Cal. Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1082–83, 1097–98, 1105–06 (9th Cir. 2011) (holding Department of Energy violated NEPA because its

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 42 of 58

## A. Changes to the CD-5 Project.

The Kunaknana Plaintiffs first assert that the Corps was required to conduct a supplemental NEPA analysis, or at least to make a reasoned determination whether supplementation was required, because changes have been made to the CD-5 project from what was analyzed in the 2004 Alpine Satellites EIS.[216]  The Kunaknana Plaintiffs correctly assert that in 2009 both EPA and USFWS recommended to the Corps that it prepare an SEIS to address changes made to the CD-5 project from what was analyzed in the 2004 Alpine Satellites EIS,[217] and it is clear from the 2011 ROD that the Corps was aware of this issue during the administrative process.[218]  Accordingly, the Court finds that issue exhaustion does not preclude the Kunaknana Plaintiffs from raising this issue as part of their NEPA claim.

As examples of project changes that have occurred since 2004, the Kunaknana Plaintiffs point to the relocation of the CD-5 pad 1.3 miles west, the increase in the number of wells, the changed location of the Nigliq Channel bridge, the changed road

---

"conclusory statement" that its designation of national interest electric transmission corridors would have no environmental impact was inadequate explanation for its decision not to prepare EIS).

[216] Docket 108 at 34 (Kunaknana Pls.' Mot. for Summ. J.).

[217] *See* Docket 146 at 11–12 & n.11 (Kunaknana Pls.' Reply) (citing A.R. 4077 (6/05/09 Letter from USFWS to Corps) ("In light of the proposed changes to the CD-5 development project, the lack of alternatives analysis, and advances in relevant technology, the Service recommends the development of a Supplemental EIS to update the Alpine Satellites Development EIS."); A.R. 4082 (6/09/09 Letter from EPA to Corps) ("EPA strongly recommends the USACE carefully consider preparing a Supplemental EIS to analyze this current, specific proposal in light of the significant changes made by the applicant . . . .")).

[218] *See* A.R. 6811, 6814 (2011 ROD) (responding to EPA's and USFWS's recommendations that the Corps prepare SEIS in light of changes to CD-5 project).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 43 of 58

alignment and increased road length, the increase in the number of bridges, the increased amount of fill, the increased pad size, and certain mitigation measures.[219] They contend that the Corps failed to adequately evaluate the significance of these modifications, instead providing "only unsupported conclusions in [the 2011 ROD] that the CD-5 project[] has not been 'substantial[ly] changed' since the Alpine Satellites EIS."[220]

In the 2011 ROD, the Corps stated that it had determined that the project changes were not substantial enough to warrant preparation of an SEIS,[221] but it offered only minimal explanation for this determination. In response to the comments from EPA and USFWS recommending that the Corps prepare an SEIS, the Corps stated:

> The Corps . . . disagrees that ConocoPhillips's latest proposal is substantially different than that identified in the FEIS. ConocoPhillips's current proposal is very similar to the Alternative F theme that was analyzed in the FEIS. Alternative F in the FEIS was identified as the lead agency's (BLM) preferred alternative.[222]

Then, in response to comments from environmental groups, the Corps offered a somewhat different explanation for its decision not to prepare an SEIS to address project changes:

> ConocoPhillips's proposal is not substantially different than the alternatives analyzed in the FEIS. The determination has been made that the FEIS is still adequate and relevant for the evaluation of the CD-5

---

[219] Docket 108 at 33–34 (Kunaknana Pls.' Mot. for Summ. J.).

[220] Docket 108 at 34 (Kunaknana Pls.' Mot. for Summ. J.) (third alteration in original) (citing A.R. 6811 (2011 ROD)).

[221] *See* A.R. 6899 (2011 ROD).

[222] A.R. 6811 (2011 ROD) (response to EPA); A.R. 6814 (2011 ROD) (response to USFWS).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 44 of 58

project at this time.  Numerous alternatives and road alignments were analyzed in the FEIS including a road route along the southerly route that is currently proposed by ConocoPhillips.  Although there have been some changes to the locations and sizes of the drill pad the impacts that will result from the project are similar.[223]

The referenced alternative with a southerly road route appears to be Alternative C-1 in the Alpine Satellites EIS.[224]

The problem with the assertion that the approved CD-5 project is similar to Alternative F in the Alpine Satellites EIS is that it contains several changes, including the relocation of the CD-5 drill pad 1.3 miles to the west of the location analyzed in the EIS and an increase in the number of wells from 22 to 33.[225]  Thus, as the Corps recognized elsewhere in the 2011 ROD, the approved CD-5 project is only "similar *in concept* to Alternatives A and F in the FEIS," since the "locations of the road, bridge, pipeline route and pad . . . have changed."[226]  And while a more southerly road route may have been analyzed as part of Alternative C-1, the location of the CD-5 pad as finally approved was not analyzed as part of any of the EIS alternatives.[227]  The Corps

---

[223] A.R. 6837 (2011 ROD).

[224] *See* A.R. 2569 (Alternative C-1 Site Map); *see also* Docket 129 at 46–47 & n.181 (ConocoPhillips Opp'n) (asserting location of Nigliq Channel bridge in Alternative C-1 is "indistinguishable" from location approved in 2011 ROD).

[225] *See* A.R. 6781–82 (2011 ROD) ("The CD-5 drill pad was relocated 1.3 miles to the west of the site originally identified in the FEIS . . . .  Additionally, the size of the CD-5 drill pad has increased to accommodate an increase in the proposed number of wells and additional surface infrastructure.").

[226] A.R. 6787 (2011 ROD) (emphasis added).

[227] The location of the CD-5 pad was the same in each of the EIS alternatives.  *See* A.R. 2567–74 (Maps of Alternatives); *see also* Docket 146 at 18 (Kunaknana Pls.' Reply) ("[N]one of the alternatives reviewed in the 2004 EIS include an option with the drill pad located 1.3 miles to the

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 45 of 58

stated in the 2011 ROD that the changed location and size of the drill pad will result in

"similar" impacts, but it provides no explanation for this assertion anywhere in the

record.[228]  Rather, the Corps undercuts this assertion elsewhere in the record by stating

that the proposed location for CD-5 in the 2004 Alpine Satellites EIS "was selected to

avoid the most valuable wetlands and minimize other adverse impacts," but "it was later

moved by ConocoPhillips to optimize well production from the reservoir when better

geophysical information became available."[229]

In its brief, ConocoPhillips offers a seven-page explanation for how the project

changes "were all minor and of no meaningful environmental consequence, fall within

the range of impacts previously considered or were included as mitigation measures

undertaken to reduce impacts below levels identified in the EIS."[230]  However, as the

Kunaknana Plaintiffs correctly point out in their reply, this Court "may not accept . . .

---

west."); *cf.* A.R. 6868 (2011 ROD) ("Impacts to the Nigliagvik Channel were not addressed in the FEIS . . . .").

[228] *See* Docket 146 at 17 n.39 (Kunaknana Pls.' Reply) ("While the Corps notes that there 'have been some changes to the locations and sizes of the drill pad [and] the impacts that will result from the project are similar,' it offers no actual analysis to show that the impacts will be similar.").

[229] *See* A.R. 5766–67 (9/23/11 Corps Memorandum for Record); *see also* A.R. 6781 (2011 ROD) ("The CD-5 drill pad was relocated 1.3 miles to the west of the site originally identified in the FEIS for several reasons.  According to ConocoPhillips, the new location will enable better access to the CD-5 reservoir to the west and south.  Wells in the new location will have lower angles thus less risk of having problems during well service and maintenance operations.  Additionally, the size of the CD-5 drill pad has increased to accommodate an increase in the proposed number of wells and additional surface infrastructure.").

[230] *See* Docket 129 at 45–52 (ConocoPhillips Opp'n).  Similarly, ASRC and Kuukpik point out that the location of the Nigliq Channel bridge was changed to ameliorate the Nuiqsut community's environmental and subsistence concerns.  *See* Docket 140 at 15 (ASRC Opp'n); Docket 141 at 18 (Kuukpik Opp'n).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 46 of 58

*post hoc* rationalizations for agency action."[231]   Rather, "an agency's action must be upheld, if at all, on the basis articulated by the agency itself."[232]   And after carefully reviewing the record in this case, the Court finds that the Corps failed to articulate a satisfactory explanation, founded on a reasoned evaluation of the relevant factors, for its decision to forego preparation of an SEIS to address changes to the CD-5 project. The Court concludes, therefore, that the Corps' decision was arbitrary.[233]

## B. New Information.

The Kunaknana Plaintiffs next assert that the Corps was required to conduct a supplemental NEPA analysis, or at least to make a reasoned decision whether supplementation was required, because new information has been generated since the 2004 Alpine Satellites EIS.[234]   The Kunaknana Plaintiffs point to two categories of "new information."   First, they point to documents cited in the 2011 ROD that post-date the 2004 Alpine Satellites EIS.[235]   Second, they point to "new information about the impacts of climate change on the project."[236]   The Court will analyze these two categories of new information in turn.

---

[231] *See* Docket 146 at 18 n.46 (Kunaknana Pls.' Reply) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983)).

[232] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 50.

[233] The Court expresses no opinion at this time about whether an SEIS is necessary.

[234] Docket 108 at 41 (Kunaknana Pls.' Mot. for Summ. J.).

[235] Docket 108 at 42–43 (Kunaknana Pls.' Mot. for Summ. J.).

[236] Docket 108 at 43–46 (Kunaknana Pls.' Mot. for Summ. J.).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 47 of 58

*i.*  *Documents Cited in the 2011 ROD that Post-Date the 2004 Alpine Satellites EIS.*

The Kunaknana Plaintiffs assert that the 2011 ROD "relies upon several post-Alpine Satellites EIS documents, reports, and studies that are all new information," and that "there is no indication in the record that the Corps ever analyzed the significance of th[is] new information . . . despite the Corps' reliance on the documents in the decision-making process."[237]  The Corps certainly had knowledge of the post-2004 documents it cited in the 2011 ROD, and under NEPA it had a "continuing duty to . . . evaluate new information relevant to the environmental impact of its actions."[238]  Accordingly, the Court finds that issue exhaustion does not preclude the Kunaknana Plaintiffs from arguing in this appeal that those documents that are cited in the 2011 ROD constitute new information that the Corps failed to adequately evaluate under NEPA.

In their briefing, the Kunaknana Plaintiffs list eleven post-2004 documents cited in the 2011 ROD, including certain information provided by ConocoPhillips and other entities after the administrative remand of the 2010 permit decision.[239]  And yet the 2011 ROD contains only the conclusory statement that "there are not significant new circumstances or information relevant to environmental concerns and bearing on the proposal or impacts."[240]

---

[237] Docket 108 at 42–43 (Kunaknana Pls.' Mot. for Summ. J.).

[238] *See Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 559 (9th Cir. 2000) (quoting *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1023 (9th Cir. 1980)).

[239] *See* Docket 108 at 42–43 (Kunaknana Pls.' Mot. for Summ. J.).

[240] A.R. 6899 (2011 ROD); *see also* A.R. 6814, 6816, 6837–38 (2011 ROD).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 48 of 58

In their briefing, the Corps and ConocoPhillips assert that the Kunaknana Plaintiffs have failed to demonstrate that any of the post-2004 documents cited in the 2011 ROD contain significant new information necessitating an SEIS.[241]   However, it is not the Plaintiffs' duty to assess the significance of the post-2004 information.  Rather, when provided with this new information, it was the Corps' duty to "consider it, evaluate it, and make a reasoned determination whether it [wa]s of such significance as to require [an SEIS]."[242]

The Kunaknana Plaintiffs maintain that the Corps' conclusory statement that there is no significant new information is at odds with the Corps' express reliance on post-2004 information in making its LEDPA determination.[243]   In the 2011 ROD, the Corps explained that the new information provided by ConocoPhillips and others post-remand caused the Corps to modify its LEDPA determination from the HDD alternative to the bridges,[244] a fact the Corps and ConocoPhillips recognize in their briefing on that

---

[241] Docket 131 at 38 n.6 (Corps Opp'n); Docket 129 at 55 (ConocoPhillips Opp'n).

[242] *See Friends of the Clearwater*, 222 F.3d at 558 (second alteration in original) (quoting *Warm Springs Dam Task Force*, 621 F.2d at 1024).

[243] *See* Docket 146 at 25 (Kunaknana Pls.' Reply) ("[A]bsent from the Corps' review is a discussion of why th[e] information that played a decisive role in the [LEDPA determination] is not significant and warrants a supplemental NEPA analysis.  The Corps and [ConocoPhillips] simply cannot have it both ways.  They cannot assert on the one hand that there was significant new information that supports the Corps' finding that HDD is not the LEDPA, and then argue that the information was minor, not significant and did not trigger any NEPA obligations." (internal quotation marks omitted)).

[244] *See, e.g.*, A.R. 6787 (2011 ROD) ("A complete design analysis of the logistics for the HDD alternative was submitted by [ConocoPhillips] on June 24, 2011."); A.R. 6773 (2011 ROD) ("During the remand information presented by ConocoPhillips, the [State Pipeline Coordinator's Office Chief Pipeline Engineer], and the Federal Joint Pipeline Coordinator's Office . . . led me to reconsider the environmental consequences associated with the roadless scenario that had been previously determined to be a potential LEDPA.").

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 49 of 58

topic.[245]  Accordingly, the Court agrees with the Kunaknana Plaintiffs that absent a reasoned explanation in the record, the Corps' decision to rely on certain post-2004 studies and information in evaluating the LEDPA for ConocoPhillips's CD-5 proposal under the CWA, while at the same time summarily disclaiming the significance of that information for NEPA purposes, was arbitrary.[246]

   ii.   *New Information About the Impacts of Climate Change on CD-5.*

   The 2004 Alpine Satellites EIS contains a short, general discussion of climate change.[247]  With respect to potential impacts from climate change on the development of CD-3 through CD-7, it notes that an increase in mean surface temperature could shorten the ice road season.[248]  Additionally, it states:

> Future climate changes could potentially affect a number of meteorological
> conditions in coastal regions such as the North Slope.  These conditions
> include frequency and intensity of storms, storm surges, and flooding.
> Changes in weather patterns could potentially result in a greater frequency
> of stronger storms.  Melting ice reserves, and subsequent changes in

---

[245] Docket 131 at 20 (Corps Opp'n) ("The Corps concluded that this new information played a decisive role in its [LEDPA] determination . . . ."); Docket 129 at 32 (ConocoPhillips Opp'n) (stating critical factor that led the Corps to reconsider whether ConocoPhillips's proposal was the LEDPA was "substantial new information . . . presented by federal, state and local agencies, Native Alaskan interests, and [ConocoPhillips]").  In its brief, the State of Alaska provides a detailed overview of the "additional expert opinions and analyses" it submitted to the Corps following the administrative remand.  *See* Docket 142 at 10–25 (State of Alaska Opp'n).  But the State then maintains that nothing it submitted "would constitute significant new information for purposes of [NEPA]."  *See* Docket 142 at 10 n.19.

[246] ConocoPhillips offers some explanation in its brief for why it believes the post-2004 documents cited in the 2011 ROD did not warrant preparation of an SEIS.  *See* Docket 129 at 55–56 (ConocoPhillips Opp'n).  However, as explained in the preceding section, the Court cannot rely on post-hoc rationalizations to affirm the Corps' decision.  *See supra* notes 231–32 and accompanying text.

[247] *See* A.R. 490–93 (2004 Alpine Satellites EIS).

[248] A.R. 493 (2004 Alpine Satellites EIS).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 50 of 58

mean sea level, could potentially increase the frequency of storm surges of a given height.  Rising river and sea levels from climate change could also result in increased frequency and intensity of flooding.  Although there has been no evidence to correlate an increase in storm activity with climate change, studies continue to investigate the potential role that climate change may have on future meteorological conditions.[249]

The Kunaknana Plaintiffs assert that "[b]etween 2004 and 2011, a considerable body of science developed regarding the impacts of climate change on the Arctic," but the Corps failed to make a reasoned determination of the significance of this information to CD-5, instead providing only "a handful of cursory statements about the risks from climate change."[250]

>    a. *ConocoPhillips's Motion to Strike Kunaknana Plaintiffs' Extra-Record Summary Judgment Exhibits.*

The bulk of the new information about the impacts of climate change that the Kunaknana Plaintiffs assert the Corps failed to consider is not in the agency record; instead, it is presented to the Court in the form of five publicly available reports concerning climate change attached as exhibits to the Kunaknana Plaintiffs' summary judgment brief.[251]  ConocoPhillips has moved to strike these extra-record reports.[252]

---

[249] A.R. 493 (2004 Alpine Satellites EIS).

[250] Docket 108 at 43–44 (Kunaknana Pls.' Mot. for Summ. J.).

[251] *See* Docket 109 at 2–3 (Bostrom Decl. in Supp. of Kunaknana Pls.' Mot for Summ. J.); Dockets 109-2 – 109-7 (Exs. 1–5 to Kunaknana Pls.' Mot. for Summ. J.).  In their summary judgment motion, the Kunaknana Plaintiffs assert the Court should consider the reports because they are demonstrative of the "substantial body" of post-2004 information concerning climate change that the Corps should have considered in a supplemental NEPA analysis.  Docket 108 at 45 n.254 (Kunaknana Pls.' Mot. for Summ. J.).

[252] *See* Docket 126 at 5 (ConocoPhillips Mot. to Strike).  Intervenor-Defendants ASRC, State of Alaska, and Kuukpik joined in this motion at Dockets 132, 133, and 134, respectively.

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 51 of 58

"Generally, judicial review of an agency decision [under the APA] is limited to the administrative record on which the agency based the challenged decision."[253]   In their opposition to ConocoPhillips's motion to strike, the Kunaknana Plaintiffs assert that the climate change reports fit under an exception to this rule "that allows the court to consider extra-record documents where it needs to determine whether the agency has considered all relevant factors and has explained its decision."[254]   However, the extra-record climate change reports are not necessary to determine whether the Corps provided an adequate explanation in the record for its decision not to prepare an SEIS,[255] which is the only issue the Court is deciding at this time.   Therefore, ConocoPhillips's motion to strike Exhibits 1–5 to the Kunaknana Plaintiffs' summary judgment brief will be granted.[256]

### b.  Issue Exhaustion.

With respect to new information concerning climate change, the Corps makes an issue exhaustion argument.   The Corps asserts that the Kunaknana Plaintiffs "fail to show that anyone ever contended that new climate change information required

---

[253] *Fence Creek Cattle Co. v. U.S. Forest Serv.*, 602 F.3d 1125, 1131 (9th Cir. 2010).

[254] Docket 137 at 5 (Kunaknana Pls.' Opp'n to Mot. to Strike) (citing *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996)).

[255] *Cf. supra* Discussion Part II (explaining how reviewing court must look to agency record to determine whether agency articulated rational explanation for its action).

[256] In the same motion, filed in *Kunaknana, et al. v. U.S. Army Corps of Engineers, et al.*, Case No. 3:13-cv-00044, ConocoPhillips also moved to strike Exhibit 5 to CBD's motion for summary judgment.  Docket 126 at 4–5 (ConocoPhillips Mot. to Strike).   Because the Court is dismissing the action filed by CBD for lack of standing, this request will also be granted.

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 52 of 58

supplementation of the Alpine EIS."[257]  It maintains that absent such a showing, "the Court should not consider the contention that this new information required supplementation of the Alpine EIS."[258]

The Kunaknana Plaintiffs assert that "EPA alerted the Corps to post-2004 information pertaining to climate change and impacts to the Arctic and recommended that the Corps analyze the project in light of that new information."[259]  They cite to a portion of a five-page letter dated June 9, 2009 from EPA to the Corps[260]:

> We remain particularly concerned about the potential adverse impacts to the regional surface hydrology within the Nigliq Channel and [Colville River Delta] that may be caused by the bridge and road especially during flood events.  The Scenarios Network for Alaska Planning has predicted changes in temperature, precipitation, and season length (thaw to freeze up) using General Circulation models utilized by the Intergovernmental Panel on Climate Change for future climate scenarios.  It is prudent to analyze this project in light of these predicted changes with respect to the potential for increased frequency of extreme events.[261]

The Kunaknana Plaintiffs also cite to a letter dated September 9, 2009 from EPA to the Corps.[262]  Like the EPA's June 2009 letter, that letter states that a certain surface water

---

[257] Docket 131 at 40 (Corps Opp'n) (citation omitted).

[258] Docket 131 at 40 (Corps Opp'n).

[259] Docket 146 at 30 (Kunaknana Pls.' Reply).

[260] Docket 146 at 30 & n.110 (Kunaknana Pls.' Reply) (citing A.R. 4081 (6/09/09 Letter from EPA to Corps)).

[261] A.R. 4081 (6/09/09 Letter from EPA to Corps).  In the Kunaknana Plaintiffs' response to ConocoPhillips's motion to strike, they indicate that the Scenarios Network for Alaska Planning document referenced by EPA is Exhibit 2 to their summary judgment brief.  *See* Docket 137 at 8–9 n.31 (Kunaknana Pls.' Opp'n to Mot. to Strike).  The document is not included in the record.

[262] Docket 108 at 44 (Kunaknana Pls.' Mot. for Summ. J.) (citing A.R. 4591 (9/09/09 Letter from EPA to Corps)).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 53 of 58

model "does not predict changes in hydrology patterns that are likely to result from future climate change scenarios."[263]

Additionally, the Kunaknana Plaintiffs assert the Corps "acknowledged in [the 2011 ROD] that there was new information on climate change that arose after issuance of the 2004 EIS, indicating it was cognizant of the issue and thereby waiving any [issue] exhaustion argument."[264] They cite to a portion of the 2011 ROD that states: "Changes that have occurred [since the 2004 Alpine Satellites EIS] include the listing of critical habitat for polar bear, climate change, and future development."[265] However, it is not clear whether this sentence means that new climate change information has been generated since 2004 regarding the CD-5 project or that the climate has changed since 2004.

In the 2011 ROD, the Corps discussed the ways that climate change may impact the CD-5 project:

---

[263] A.R. 4591. After independently reviewing the record, this Court has found one other document potentially alerting the Corps to new information concerning climate change: a letter dated June 12, 2009 from environmental groups and individuals to the Corps. *See* A.R. 9521 (6/12/09 Letter from Environmental Groups to Corps). The letter states that "[t]here is substantial new information about current global climate change impacts that are already stressing fish, wildlife, subsistence and which would be a major factor in the integrity of the project facilities and their impacts over the life of the proposed project." A.R. 9523 (6/12/09 Letter from Environmental Groups to Corps). As examples of climate change impacts that could affect the project, the letter points to the loss of Beaufort Sea ice and ocean acidification, and it cites two 2009 articles concerning those impacts. A.R. 9523, 9530 (6/12/09 Letter from Environmental Groups to Corps). The cited articles are not among the exhibits to the Kunaknana Plaintiffs' motion for summary judgment, and the articles themselves are not included in the record.

[264] Docket 146 at 30 n.110 (Kunaknana Pls.' Reply) (citing A.R. 6899 (2011 ROD)); *cf. supra* notes 199–200 and accompanying text (explaining "so obvious" exception to issue exhaustion rule).

[265] A.R. 6899 (2011 ROD).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 54 of 58

All of the CD-5 alternatives could be affected by climate change in the form of increased global ambient temperature, increased snowfall, sea level rise, effects of hydrologic changes due to more rapid snowmelt and increased water levels during spring break up. Melting permafrost and thermokarsting could cause additional gravel fill requirements for all of the project alternatives.[266]

The Corps also provided a brief analysis of how climate change might affect each of the analyzed alternatives in the 2011 ROD.[267] However, whether the Corps was aware of and considered post-2004 information in this analysis is unclear.

"[T]here is no bright-line standard" for determining when an issue has been raised before an agency with clarity sufficient to allow a plaintiff to overcome the issue exhaustion bar.[268] The portions of EPA's letters cited by the Kunaknana Plaintiffs appear to be more of a critique of the hydrology analysis in the record than an effort to apprise the Corps of new information concerning climate change that might necessitate a supplemental NEPA analysis.[269] And the Kunaknana Plaintiffs have not pointed to any place in the 2011 ROD clearly demonstrating that the Corps had independent knowledge of certain new climate change information that might necessitate a supplemental NEPA analysis for CD-5. At the same time, however, it is clear from the

---

[266] A.R. 6887 (2011 ROD).

[267] *See* A.R. 6887–89 (2011 ROD).

[268] *See Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 968 (9th Cir. 2006) (quoting *Idaho Sporting Congress, Inc. v. Rittenhouse*, 305 F.3d 957, 965 (9th Cir. 2002)).

[269] *Cf.* A.R. 6808 (2011 ROD) (responding to EPA's letters). With respect to NEPA supplementation, it appears the Corps interpreted the letters from EPA and the environmental groups to argue only that changes to the project required a supplemental NEPA analysis. *See* A.R. 6811, 6837–38 (2011 ROD) (responding to EPA's and environmental groups' letters).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 55 of 58

2011 ROD that the Corps was aware that climate change might alter the environmental impact of CD-5.

Rather than resolve the issue exhaustion question at this time, the Court has decided that whether, and to what extent, the Corps should evaluate post-2004 climate change information is better determined after further briefing from the parties on the appropriate remedy for the Corps' failure to adequately explain its decision not to prepare an SEIS for CD-5 to address changes to the project as well as new information relied upon in the 2011 ROD.

## V. Claim 2: Violation of CWA.

To decide the Kunaknana Plaintiffs' CWA claim at this time would be premature. NEPA procedures are designed to ensure the agency and the public have an opportunity to consider all of the relevant environmental information "before decisions are made and before actions are taken."[270] Thus, the Court will not determine whether the Corps' decision to issue the Section 404 permit to ConocoPhillips violated the CWA until after the Kunaknana Plaintiffs' NEPA claim has been resolved.

## VI. Remedy.

In its brief, ConocoPhillips requests that if the Court rules in favor of Plaintiffs on any of their claims, the Court allow the parties to provide additional briefing on what would be an appropriate remedy.[271] The Court agrees with ConocoPhillips that further briefing from the parties at this juncture could be of assistance to the Court.

---

[270] See 40 C.F.R. § 1500.1(b); see also supra Facts Part I.B (discussing NEPA's purpose).

[271] Docket 129 at 56–57 (ConocoPhillips Opp'n).

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 56 of 58

**CONCLUSION**

For the foregoing reasons, the Court hereby ORDERS as follows:

1. *Center for Biological Diversity v. U.S. Army Corps of Engineers, et al.*, Case No. 3:13-cv-00095-SLG, is DISMISSED with prejudice because Plaintiff Center for Biological Diversity lacks Article III standing.

2. With respect to filings made in *Kunaknana, et al. v. U.S. Army Corps of Engineers, et al.*, Case No. 3:13-cv-00044, the Court ORDERS as follows:

   a. The Center for Biological Diversity's Motion for Summary Judgment at Docket 106 is DENIED as moot.[272]

   b. ConocoPhillips's Consolidated Motion to Strike Plaintiffs' Extra-Record Summary Judgment Exhibits at Docket 126, and the joinders at Dockets 132, 133, and 134, are GRANTED.[273] The Clerk of Court shall strike from the record Exhibit 5 to CBD's Motion for Summary Judgment, filed at Docket 106-6, and Exhibits 1–5 to the Kunaknana Plaintiffs' Motion for Summary Judgment, filed at Dockets 109-2 – 109-7.

   c. The Kunaknana Plaintiffs' Motion for Summary Judgment at Docket 107 is GRANTED with respect to Plaintiffs' NEPA claim as follows: the Corps' determination that a Supplemental Environmental Impact

---

[272] The copy of this motion filed at Docket 42 in *Center for Biological Diversity v. U.S. Army Corps of Engineers, et al.*, Case No. 3:13-cv-00095, is also DENIED as moot.

[273] The copy of ASRC's joinder filed at Docket 44 in *Center for Biological Diversity v. U.S. Army Corps of Engineers, et al.*, Case No. 3:13-cv-00095, is also GRANTED.

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 57 of 58

Statement was unnecessary was arbitrary and capricious because the Corps failed to provide a reasoned explanation for that determination that addressed the changes to the CD-5 project since the 2004 Environmental Impact Statement and the new information the Corps relied upon in making its Least Environmentally Damaging Practicable Alternative determination for purposes of Section 404 of the Clean Water Act. ConocoPhillips's Cross-Motion for Summary Judgment at Docket 129 is DENIED with respect to this claim. The Court expresses no opinion at this time whether the Corps is required to prepare a Supplemental Environmental Impact Statement.

d. Within 21 days of the date of this Order, the parties in the Kunaknana case shall file and serve, either jointly or separately, a motion(s) or stipulation that proposes the further proceedings that should occur in this matter.

DATED this 27th day of May, 2014, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE

3:13-cv-00044-SLG, *Kunaknana, et al. v. U.S. Army Corps, et al.*
3:13-cv-00095-SLG, *Center for Biological Diversity v. U.S. Army Corps, et al.*
Order Re Motions for Summary Judgment
Page 58 of 58