# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

SAM KUNAKNANA, et al.,

        Plaintiffs,

    v.

UNITED STATES ARMY CORPS
OF ENGINEERS, et al.,

        Defendants,

   and

CONOCOPHILLIPS ALASKA, INC., et
al.,

        Intervenor-Defendants.

Case No. 3:13-cv-00044-SLG

## SECOND ORDER RE MOTIONS FOR SUMMARY JUDGMENT

Plaintiffs Sam Kunaknana, et al., filed this lawsuit challenging Defendant U.S.
Army Corps of Engineers'[1] decision to issue a permit to ConocoPhillips Alaska, Inc. to fill
certain wetlands in order to develop a drill site known as CD-5, which is located in the
National Petroleum Reserve – Alaska ("NPR-A") and adjacent to the Colville River Delta.[2]
Plaintiffs assert that the Corps' issuance of the permit violated the National Environmental

---

[1] The Amended Complaint names as defendants the Corps as well as Corps officers Thomas P.
Bostick and Christopher D. Lestochi.  This Order refers to all three defendants collectively as "the
Corps."

[2] Docket 117 (Am. Compl.) at ¶¶ 1, 57.  The Center for Biological Diversity filed a separate lawsuit
that was jointly managed with this action.  *See* Docket 86 (Order Establishing Joint Case Mgt.).
The Court dismissed that case because the Center for Biological Diversity lacked Article III
standing.  *See* Docket 175 (Order re Mots. for Summ. J.) at 57.

Policy Act ("NEPA"), 42 U.S.C. §§ 4321 – 4327, and Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344.[3]  ConocoPhillips, the Arctic Slope Regional Corporation ("ASRC"), the State of Alaska, the North Slope Borough, and Kuukpik Corporation, the Alaska Native Claims Settlement Act village corporation for the Inupiat Eskimo Village of Nuiqsut,[4] have all joined this action as Intervenor-Defendants in support of the Corps.[5]

In 2001 ConocoPhillips announced the discovery of oil to the west of the Alpine oil field in the Colville River Delta and NPR-A.  In 2004, as part of the NEPA review process, the Alpine Satellite Development Plan Final EIS ("2004 FEIS") was issued for the entire project. The 2004 FEIS was prepared by the Bureau of Land Management ("BLM") with four cooperating entities: the Corps, the U.S. Environmental Protection Agency ("EPA"), U.S. Coast Guard, and the State of Alaska.  The 2004 FEIS is approximately 2,547 pages long and analyzes six alternative development plans for all five of the satellite oil production pads at ConocoPhillips' Alpine field.[6]  This case involves only one of those production pads – the CD-5 drill site.

In September 2005, ConocoPhillips submitted an application to the Corps for a Section 404 permit under the Clean Water Act to develop CD-5.  In February 2008,

---

[3] Docket 117 (Am. Compl.) at 1 – 2 ¶¶ 1 – 2.

[4] Docket 47 at 2 ¶ 2 (Chinn Decl. in Supp. of Kuukpik Mot. to Intervene).

[5] Docket 14 (Order Granting ConocoPhillips Mot. for Intervention), Docket 25 (Order Granting ASRC Mot. for Intervention), Docket 38 (Order Granting State of Alaska Mot. for Intervention), Docket 51 (Order Granting Kuukpik Mot. for Intervention), and Docket 86 at 2 (Order Establishing Joint Case Mgt.) (granting intervention to North Slope Borough).

[6] A.R. 0191 (2004 FEIS). One of the alternatives is a "no action" alternative.

ConocoPhillips asked the Corps to suspend the processing of that application while ConocoPhillips worked with Kuukpik to resolve project-related issues. In December 2008, ConocoPhillips submitted a modified permit application to the Corps. In February 2010, the Corps issued a Record of Decision ("2010 ROD") denying ConocoPhillips' modified application because the Corps determined that ConocoPhillips had failed to demonstrate that its proposal was the Least Environmentally Damaging Practicable Alternative, or "LEDPA," as required by the Clean Water Act.[7] ConocoPhillips administratively appealed that determination. In December 2010, a Corps review officer remanded the permit application to the Corps District Engineer.[8] ConocoPhillips and other interested parties then provided the Corps with additional information about ConocoPhillips' proposal and certain alternatives.[9]

In December 2011, the Corps issued the Record of Decision ("2011 ROD") that is the focus of this appeal, which granted ConocoPhillips' modified permit application. The 2011 ROD concluded that a supplemental environmental impact statement ("SEIS") was not needed to evaluate ConocoPhillips' revised permit application because "there have not been substantial changes in the proposed action that are relevant to environmental

---

[7] *See* A.R. 4792-93 (2010 ROD); *see also* 33 U.S.C. § 1344.

[8] A.R. 7366-7403 (4/2/10 Request for Appeal); A.R. 7590-91 (Administrative Appeal Decision).

[9] A.R. 6782 (2011 ROD).

concerns; and . . . there are not significant new circumstances or information relevant to environmental concerns and bearing on the proposal or impacts."[10]

Plaintiffs initiated this action on February 27, 2013.[11]  On October 11, 2013, Plaintiffs filed a Motion for Summary Judgment.[12]  The Corps and Intervenor-Defendants each filed a response in opposition to Plaintiffs' motion, which also served as cross-motions for summary judgment.[13]

The Court issued an Order re Motions for Summary Judgment on May 27, 2014, and held that

> the Corps' determination that a Supplemental Environmental Impact Statement was unnecessary was arbitrary and capricious because the Corps failed to provide a reasoned explanation for that determination that addressed the changes to the CD-5 project since the 2004 Environmental Impact Statement and the new information the Corps relied upon in making its Least Environmentally Damaging Practicable Alternative determination for purposes of Section 404 of the Clean Water Act.[14]

The Court remanded the matter to the Corps to "set forth a reasoned explanation as to whether or not the 2004 [FEIS] warrants supplementation to address the changes in the

---

[10] Docket 175 (Order re Mots. Summ. J.) at 17-18 (quoting A.R. 6899 (2011 ROD)).  A more detailed factual and procedural history is set out in the Court's Order at Docket 175 and is not repeated here.

[11] Docket 1 (Compl.).

[12] Docket 107 (Pls.' Mot. for Summ. J.).

[13] Docket 131 (Corps Opp'n); Docket 129 (ConocoPhillips Opp'n); Docket 140 (ASRC Opp'n); Docket 141 (Kuukpik Opp'n); Docket 142 (State of Alaska Opp'n); Docket 143 (North Slope Borough Opp'n).  ConocoPhillips also filed a copy of its opposition at Docket 127.  Additionally, the Corps and ConocoPhillips later filed Notices of Errata at Dockets 135 and 144, respectively, that corrected certain citations in their briefs.

[14] Docket 175 (Order re Mots. for Summ. J.) at 57-58.

CD-5 project . . . and the new information relied upon by the Corps in its permitting decision." The Court added that it did "not intend to foreclose the possibility that on remand the Corps might decide that preparation of an SEIS is warranted."[15]

By agreement of the parties, the Court also ordered that the Corps address on remand whether post-2004 climate change information warrants the preparation of an SEIS.

The Corps filed a Supplemental Information Report ("SIR") on September 12, 2014,[16] and supplemental briefing from all the parties then ensued.[17] No party requested oral argument, and oral argument was not necessary to the Court's decision.

For the reasons discussed herein, the Court will deny Plaintiffs' renewed motion for summary judgment and grant the Corps' and ConocoPhillips' cross-motions for summary judgment.

## DISCUSSION

**I.    Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

---

[15] Docket 199 (Order re Further Proceedings) at 8.

[16] Docket 212-1 (SIR).

[17] Docket 215 (ConocoPhillips' Supp. Br.); Docket 216 (Kuukpik's Joinder in ConocoPhillips' Supp. Br.); Docket 217 (State of Alaska's Joinder in ConocoPhillips' Supp. Br.); Docket 218 (Corps' Supp. Br.); Docket 219 (ASRC's Supp. Br.); Docket 220 (North Slope Borough's Supp. Br.).

## II. Standard of Review of Agency Action

The Administrative Procedure Act ("APA") provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[18] The APA directs courts to "hold unlawful and set aside" an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[19]

The United States Supreme Court has held that "[t]he scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."[20] And the Ninth Circuit has "emphasized that deference to the agency's decisions is especially warranted when reviewing the agency's technical analysis and judgments, based on an evaluation of complex scientific data within the agency's technical expertise."[21] "Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[22]

//

//

---

[18] 5 U.S.C. § 702.

[19] 5 U.S.C. § 706(2)(A).

[20] *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

[21] *Native Village of Point Hope v. Salazar*, 680 F.3d 1123, 1130 (9th Cir. 2012) (internal quotation marks omitted).

[22] *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

**Claim One: Violation of NEPA**

**A. Standard of Review of Decision to Supplement an EIS**

An agency's decision whether to supplement an EIS is reviewed under the arbitrary and capricious standard described above.[23]  As discussed in the Court's previous Order re Motions for Summary Judgment,[24] an agency is not required to prepare an SEIS every time there are changes to a project or new information comes to light.[25]  But an agency must prepare a supplement to an EIS in two circumstances:

> (i)    The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

> (ii)    There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.[26]

A dispute as to whether an SEIS is required "must be resolved in favor of the expert agency so long as the agency's decision is based on a reasoned evaluation of the relevant factors."[27]  "NEPA requires an agency to take a 'hard look' at potential environmental consequences before taking action, and if the proposed action might significantly affect

---

[23] *See League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 759-60 (9th Cir. 2014) (reviewing NEPA claim involving alleged failure to supplement EIS).

[24] Docket 175 (Order re Mots. for Summ. J.) at 40-42.

[25] *See Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 854 (9th Cir. 2013); *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1157 (9th Cir. 2008) (per curium).

[26] 40 C.F.R. § 1502.9(c).

[27] *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 376 (1989), *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 954 (9th Cir. 2003).

the quality of the environment, a supplemental EIS is required."[28]  But an agency "must have some flexibility to modify alternatives."[29]

(i)    Substantial Changes Relevant to Environmental Concerns

The first circumstance in which an SEIS is required is when the agency makes changes from those previously evaluated in an EIS that are both substantial and relevant to environmental concerns.   In *North Idaho Cmty. Action Network v. U.S. Dep't of Transportation*, the Ninth Circuit considered whether changes to a highway construction project required supplementation.  The court held that an "SEIS is required only if changes . . . may result in significant environmental impacts 'in a manner not previously evaluated and considered.'"[30]  The Ninth Circuit then examined the relative size of the changes, the reasons for them, and the mitigation measures imposed.  The court also considered the extent to which the agency had analyzed and discussed the project changes in an environmental assessment ("EA") and reevaluation.  Based on that review, the Ninth Circuit concluded that the agency's determination "that the changes . . . would not

---

[28] *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 560 (9th Cir. 2006) (internal citations omitted).   *See also League of Wilderness Defenders*, 752 F.3d at 760 ("When determining whether to issue a supplemental EIS, an agency must 'apply a rule of reason' . . . .").

[29] *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 854 (9th Cir. 2013) (quoting *California v. Block*, 690 F.2d 753, 771 (9th Cir. 1982)).

[30] 545 F.3d at 1157 (quoting *Westlands Water Dist. v. Dep't of Interior*, 376 F.3d 853, 873 (9th Cir. 2004)).

significantly impact the environment in a way not previously considered, and that a SEIS therefore was not required, was not arbitrary or capricious."[31]

*Great Old Broads for Wilderness v. Kimbell* is also instructive. There, the Ninth Circuit considered whether a supplemental EIS was necessary in connection with the U.S. Forest Service's plan to repair a road in a national forest.[32] The selected plan combined elements from several alternatives that had been discussed in the original EIS, but the selected plan as a whole had not been separately analyzed in that EIS. The plaintiff argued that preparation of a supplemental EIS was required in these circumstances. The Ninth Circuit disagreed. Relying on the Council on Environmental Quality's ("CEQ") guidance, the court held that supplementation was not required when "(1) the new alternative is a minor variation of one of the alternatives discussed in the draft EIS, and (2) the new alternative is qualitatively within the spectrum of alternatives that were discussed in the draft EIS."[33] The Circuit Court reasoned that "the Forest Service and the public could assess the cumulative effect of [the elements in the chosen alternative]" because each of those elements had been analyzed, albeit separately, in the EIS. The court also noted that the selected plan incorporated several mitigation

---

[31] 545 F.3d at 1158.

[32] 709 F.3d at 841-44.

[33] *Id.* at 854 (quoting *Russell Country Sportsmen v. U.S. Forest Service*, 668 F.3d 1037, 1045 (9th Cir. 2011) and applying it to supplementation of a final EIS).

modifications.  And the court found that the plaintiff "point[ed] to no specific changes that it deem[ed] not adequately analyzed in the final EIS."[34]

(ii)  Significant New Circumstances or Information

The second situation in which an SEIS is required is when there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.  This situation was addressed in the U.S. Supreme Court's decision in *Marsh v. Oregon Nat. Res. Council.*  The plaintiff maintained that the Army Corps of Engineers had violated NEPA by failing to prepare an SEIS after it obtained new information in relation to a dam construction project. The Court held that when a court is reviewing an agency's decision not to supplement under the arbitrary and capricious standard, "[t]his inquiry must be searching and careful, but the ultimate standard of review is a narrow one."[35]  The Court added that "courts should . . . carefully review[ ] the record and satisfy[ ] themselves that the agency has made a reasoned decision based on its evaluation of the significance – or lack of significance – of the new information."[36] Applying these principles, the *Marsh* Court evaluated the Corps' decision that there was no significant new information requiring supplementation, and concluded that the agency's determination "although perhaps disputable, was not arbitrary or capricious."[37]

---

[34] *Great Old Broads for Wilderness*, 709 F.3d at 854.

[35] *Marsh*, 490 U.S. at 378 (internal quotation marks omitted); *Selkirk Conservation Alliance*, 336 F.3d at 954.

[36] *Id.* at 378.

[37] *Id.* at 385 (internal quotation marks omitted).

In *Klamath Siskiyou Wildlands Ctr. v. Boody*, the Ninth Circuit held that the Bureau of Land Management had violated NEPA when it adopted annual species review decisions regarding protection of the red tree vole without performing any supplemental NEPA analysis.[38]  The court found that NEPA review of the decisions was warranted for two reasons:  (1) the decisions "dramatically change[d] the vole's . . . designation" and were based on data of which a substantial amount was not available when the original EIS was created, and (2) BLM had previously and unequivocally rejected the decisions' approach in its original EIS-supported land management plan.[39]

Here, Plaintiffs are asserting that the Corps violated NEPA under both of the supplementation prongs.  They maintain that an SEIS should have been prepared based on both substantial changes to the CD-5 project between 2004 and 2011 and significant new information available after the 2004 FEIS was prepared.

When the Court issued the May 2014 Order re Motions for Summary Judgment, it was not then clear whether "the Corps previously conducted a reasoned analysis of whether to prepare an SEIS and failed to adequately set out that analysis in the record, or whether it failed to conduct the reasoned analysis in the first place."[40]   In its supplemental filing, the Corps has clarified that when it prepared the 2011 ROD it had in

---

[38] *Klamath*, 468 F.3d 552-54.

[39] *Id.* at 561-62.

[40] Docket 199 (Order re Further Proceedings) at 8.

fact determined at that time that an SEIS was not necessary but had not then fully set out the basis for that determination.[41]

A common theme in Plaintiffs' supplemental briefing is that the SIR contains impermissible *post hoc* rationalizations of the Corps' decision not to prepare an SEIS.[42] And yet the Court observes that the Supreme Court, in *Citizens to Preserve Overton Park, Inc. v. Volpe*, found that such *post hoc* rationalizations may be appropriate although they are to be "viewed critically."[43] In that case, the Supreme Court remanded to the district court to review the full administrative record and accord to the agency an opportunity to make findings containing an adequate explanation for the agency's actions. Likewise, in *Alpharma, Inc. v. Leavitt*, the D.C. Circuit held that "if it is appropriate for a court to remand for further explanation, it is incumbent upon the court to consider that explanation when it arrives."[44] The D.C. Circuit explained that the rule disfavoring *post hoc* rationalizations "is a rule directed at reviewing courts which forbids judges to uphold agency action on the

---

[41] Docket 212-1 (SIR) at 1-2 ("This document summarizes the review that the Corps conducted to take a hard look at whether there was a need for [an SEIS] for CD-5 due to the potential staleness of the original NEPA document and as a the result of changes to the project requested by the applicant, reasonably foreseeable impacts . . . or post-2004 information concerning climate change.").

[42] *See, e.g.*, Docket 214 (Pls.' Supp. Br.) at 14.

[43] 401 U.S. 402, 420-21 (1971) ("It may be that the Secretary [of Transportation] can prepare formal findings including the information required by DOT Order 5610.1 that will provide an adequate explanation for his action. Such an explanation will, to some extent, be a 'post hoc rationalization' and thus must be viewed critically."); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) (holding that where "the agency [NHTSA] submitted no reasons at all" for rejecting a mandatory airbag standard, "the courts may not accept *appellate counsel's post hoc* rationalizations for agency action." (emphasis added)).

[44] 460 F.3d 1, 6 (D.C. Cir. 2006).

basis of rationales offered by anyone other than the proper decision makers . . . . [The rule] does not prohibit an agency from submitting an amplified articulation of the distinctions it sees."[45]  Here, the Corps has submitted an SIR that is signed by the Corps' North Section Chief.  And the Corps had indicated that the document is intended to provide additional explanation and articulation of the bases for the Corps' 2011 ROD, rather than a more recent rationalization of that decision.  Such an approach is permissible under the law.

### a.  Changes to the CD-5 Project

As a preliminary matter, the CEQ states that "[a]s a rule of thumb, if the proposal has not yet been implemented, or if the EIS concerns an ongoing program, EISs that are more than 5 years old should be carefully reexamined to determine if the criteria in Section 1502.9 compel preparation of an EIS supplement."[46]   Here, the SIR acknowledges that the 2004 FEIS was issued seven years before the 2011 ROD.  But the SIR also notes that ConocoPhillips' "2009 application was submitted prior to the fifth anniversary of the [2004 FEIS]" and that there was "on-going coordination with Tribes and agencies and on-going public involvement through the 7-year review period [following the 2004 FEIS]."  The SIR finds that that multi-year process resulted in "an extremely comprehensive analysis" and that no significant new information or substantial changes relevant to

---

[45] *Id.* at 6 (quoting *Local 814, Int'l Bhd. of Teamsters v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976)).

[46] "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," 46 Fed. Reg. 18,026, 18,036 (Mar. 23, 1981).

environmental concerns were identified during that process that would require an SEIS.[47] The Court finds that the Corps did not act arbitrarily or capriciously when it determined that the date of the FEIS did not, in itself, necessitate an SEIS.

With respect to the changes to the CD-5 project that have been made since the 2004 FEIS, these changes are each identified and examined in the SIR, and are in turn each discussed below.

### 1. Relocation of Nigliq Channel Bridge Crossing[48]

The approved CD-5 design includes a bridge that crosses the Nigliq Channel at a location that was not specifically analyzed in the 2004 FEIS. But the SIR observes that the 2004 FEIS "analyzed potential bridge crossings both north (downstream) and south (upstream) from the location that was reviewed in the 2011 ROD."[49] According to the

---

[47] Docket 212-1 (SIR) at 4. In this discussion on the age of the FEIS, the SIR also states that "due to the remoteness of the location of the proposed activities, [the Corps was] able to confirm that there were no changed circumstances at the site." Docket 212-1 (SIR) at 4. The SIR does not explain this statement, but it may be referring to a determination that there were no changes to the human environment at the site. *See* Forty Questions 46 Fed. Reg. at 18,033 ("In all cases, the policy, plan, or program must have the potential for significantly affecting the quality of the human environment in order to require an EIS.").

[48] In articulating the basis for its decision that supplementation was not necessary due to the bridge relocation, the SIR first states that the Corps "does not regulate the size, number or *location* of bridges." Docket 212-1 (SIR) at 6 (emphasis in original). The SIR notes that the U.S. Coast Guard regulates bridges. Plaintiffs respond that "the Coast Guard's authority to permit bridges in no way limits the Corps from taking a hard look at all of the impacts from the proposed action and in turn determining whether it must supplement its NEPA analysis." Docket 214 (Pls.' Supp. Br.) at 17-18. Because the SIR does in fact address the bridge relocation on the merits, the Court does not need to resolve this jurisdictional issue. *See also* Docket 215 (ConocoPhillips' Supp. Br.) at 9.

[49] Docket 212-1 (SIR) at 7 (citing A.R. 000320 (2004 FEIS)). It is not apparent to the Court how the 2004 FEIS page cited in the SIR supports this statement.

SIR, "[t]he bridge location described in the 2011 ROD was three miles south of the northernmost alternative described in the [2004 FEIS] and two miles north of the southernmost alternative."[50]  The SIR adds that "the location of the bridges in [ConocoPhillips'] preferred alternative resulted in similar impacts (associated with these gravel fills) to any other location chosen between and including the northernmost and southernmost locations as discussed in the 2004 FEIS."[51]  The SIR also finds "no significant environmental differences identified"[52] between the bridge locations analyzed in the 2004 FEIS and the revised location.  And the Corps asserts that the new bridge location was a "minimizing measure" and was "qualitatively within the spectrum" of the alternatives considered in the 2004 FEIS.[53]

Plaintiffs assert that the bridge relocation is a significant change and the mere fact that the new site is located between the alternatives discussed in the 2004 FEIS has no import.  Specifically, Plaintiffs argue that the Corps' "[a]ssessment of options to the north

---

[50] Docket 212-1 (SIR) at 7-8.  While the record pages cited in the SIR indicate that the bridge location was three miles south of Alternative A (see A.R. 1167), the remainder of the statement is unsupported.  It would have greatly facilitated this Court's review of the bridge relocation issue had the Corps provided or cited to a map in the record that clearly identified each of the various bridge locations.

[51] Docket 212-1 (SIR) at 7.  Here again, the SIR cites to a number of pages in the administrative record that do not clearly support its conclusion.  For example,  A.R. 2931 (7/27/05 email attaching summary of CD-5 pre-application meeting) does not appear to be addressing the bridge location at issue here, as it refers to a relocation "approximately a third of a mile north of the location proposed in the EIS," rather than three miles to the south.

[52] Docket 212-1 at 8.

[53] Docket 218 (Corps' Supp. Br.) at 11.

and south has no bearing on the impacts involved with the specific location, and the final location was never analyzed in the 2004 EIS."[54]

The Court agrees with Plaintiffs that the fact that the permitted bridge is located in between the northernmost and southernmost alternatives considered in the 2004 FEIS does not, on its own, support a finding that the bridge relocation is not a substantial change. Rather, there is a need for a reasoned evaluation of the new location's topography, hydrology, and/or other environmental factors to support such a finding. The SIR's conclusory statements that the new bridge location "resulted in similar impacts . . . to any other location"[55] and "[n]o significant environmental differences were identified" between the bridge locations[56] do not demonstrate, in themselves, that the Corps took the requisite hard look at the bridge relocation. However, a review of the record cites identified by the Corps in support of its statements demonstrate that a reasoned analysis and evaluation of the new location was undertaken.[57] Therefore, the Corps' conclusion that the bridge relocation was not a substantial change from the 2004 FEIS that is relevant to environmental concerns was not arbitrary and capricious.

---

[54] Docket 214 (Pls.' Supp. Br.) at 15.

[55] Docket 212-1 (SIR) at 7.

[56] Docket 212-1 (SIR) at 8.

[57] See A.R. 1167; see also AR 6769 (2011 ROD) (discussing change in location of bridge crossing to incorporate local knowledge regarding environmental concerns); AR 6781-82 (2011 ROD) (discussing the reduced footprint of bridge widths); AR 6877 (2011 ROD) (discussing changes to bridge spans and location of piers); AR 9666 (6/19/09 Memo from Dept. of Fish & Game to Alaska Dept. of Nat. Res.) (discussing changes to the bridge location in plan modifications).

## 2. Realignment of Roads

In the approved project, the road connecting the CD-5 pad to the existing Alpine infrastructure has been realigned because the Nigliq Channel bridge and CD-5 drill pad have been relocated. This realignment increased the length of the road by 1.9 miles to a total of 6.0 miles, thereby also increasing the amount of wetlands directly impacted. The SIR states that the realigned road in the approved project avoided impacts identified in responses to the 2005 public notice and "was a result of the additional reservoir data used to maximize resource recovery of the hydrocarbons . . . which changed the pad location and the socio-cultural mitigation effort between the applicant and the Kuukpik Corporation . . . ."[58] The SIR also notes that "the road width was narrowed for most of its length in the Colville River Delta (CRD)."[59]

The SIR states that the 6.0-mile permitted road "was within the range of alternatives described in the 2004 FEIS falling between Alternatives A/F and C."[60] The SIR explains:

> Due to the fact that the road in Alternatives A and F continued beyond CD-5 toward CD-6 there was only a fraction of a mile difference (approximately 0.67-miles) between the length of the road passing beyond CD-5 toward CD-6 in the 2004 proposal and the permitted road described in the 2011

---

[58] Docket 212-1 (SIR) at 8.

[59] Docket 212-1 (SIR) at 8 (citing A.R. 006782 (2011 ROD)).

[60] Docket 212-1 (SIR) at 9 (citing A.R. 002569-70 (2004 FEIS)). The cited documents are two maps of Alternatives C-1 and C-2. But it is not clear to the Court how those documents support the SIR's conclusion, as these maps do not indicate where the 2011 permitted road would be located.

> ROD.  The road shown in Alternative A actually crosses the alignment of
> the 6.0-mile road that was authorized in 2011.[61]

The SIR concludes that "the 1.9 mile increase in length [of the road] was viewed by the

Corps as not significant in context of the whole project area (306 acres including CD-3

thru CD-7) for purposes of NEPA."[62]  And the SIR finds that the increased road footprint

was adequately analyzed in the 2004 FEIS and fully mitigated in the 2011 ROD.  Based

on these findings, the Corps determined that an SEIS was not required due to the road

modification.

Plaintiffs assert that the Corps is improperly "cobbling together" different parts of

various alternatives.  Plaintiffs cite to *Miccosukee Tribe of Indians of Florida v. United*

*States*, a case in which the Southern District of Florida held that a NEPA violation had

occurred when the Corps failed to prepare an SEIS in connection with changes to a water

management plan.[63]  The Corps had asserted that its analysis of other earlier projects

pre-approved the new structures. But the Florida court found that the changes, which

included additional pump stations and reservoirs, "could hardly be considered

insignificant" and that "[t]he scope of the construction itself is vast."[64]  Here, the CD-5

---

[61] Docket 212-1 (SIR) at 9.  The SIR notes that the 2004 FEIS "also considered a southern road route to CD-5 which was 11.8 miles long and connected to the existing road between CD-1/2 and CD-4 very close to the same location that was analyzed and approved in the 2011 ROD."  Docket 212-1 (SIR) at 10 (citing A.R. 000379 (2004 FEIS)).

[62] Docket 212-1 (SIR) at 9.

[63] Docket 214 (Pls.' Supp. Br.) at 14 (citing *Miccosukee Tribe of Indians of Florida v. United States*, 420 F. Supp. 2d 1324 (S.D. Fla. 2006).

[64] 420 F. Supp. 2d at 1333-35.

construction project is not vast in scope. And, as noted above, the Ninth Circuit allows an agency to consider different elements from previously analyzed alternatives when assessing the need for an SEIS.[65]

Certainly, this Court's evaluation of the Corps' determination that the road modification did not necessitate an SEIS is hampered by the lack of clarity in the SIR. It would have been far easier to assess the impact of the road change had the Corps provided a map that displayed all the relevant road alternatives evaluated in the 2004 FEIS, as well as the 2011 permitted road. And yet, upon consideration of the entire record, the Court finds that although perhaps unartfully set forth, the Corps' determination that the road modification was not a substantial change relevant to environment concerns was not arbitrary and capricious.

3. **Increase in Size/Realignment of CD-5 Pad**

The approved project increases the size of the CD-5 pad from 9.1 acres to 11.7 acres to accommodate a projected increase in the number of wells from 22 to 33. The pad was also relocated 1.3 miles to the south and west. The SIR states that the Corps considered this pad size increase and relocation to "be a measure to avoid the need for another pad in the future which potentially could have doubled the footprint if a second 9.8-acre drill pad were required to maximize resource recovery of the hydrocarbons."[66] The SIR also notes that the 2004 FEIS had analyzed an 11.6 acre pad as well as a 13.9

---

[65] *Great Old Broads,* 709 F. 3d at 853-854; see *supra* at 9-10.

[66] Docket 212-1 (SIR) at 10.

acre pad for CD-5 and therefore "determined that the 2004 FEIS adequately covered this new footprint."[67] The SIR adds that the relocated pad is on relatively drier tundra, thereby minimizing impact to the threatened eider "and other higher value areas." [68] Based on these considerations, the Corps determined that the changed location was preferable to the 2004 FEIS alternatives, and that the increased pad size "was not considered a substantial change in light of adverse environmental concerns; and, therefore, it did not warrant the preparation of a SEIS."[69]

Plaintiffs argue that the Corps' statements about the pad size and location being "preferable" are conclusory. They note that the SIR provides only one citation for its conclusion that the increased pad size and location are preferable and that that citation refers to realigning the *road* to higher ground, not the pad.[70] In short, Plaintiffs argue that the Corps failed to take the requisite "hard look" at the relocation.[71]

---

[67] Docket 212-1 (SIR) at 11.

[68] Docket 212-1 (SIR) at 11 (citing A.R. 006882 (2011 ROD), which, as the SIR notes, states that the *road* was aligned on higher ground whenever possible). The SIR also cites to the FEIS regarding these conclusions.

[69] Docket 212-1 (SIR) at 11 (citing several pages in the 2004 FEIS that discuss impacts generally and A.R. 009490 (Notice of Application) for the statement that there are "no significant adverse impacts to wetland habitats that are different in intensity or character form [sic] those addressed in 2004 alternatives analysis."). However, A.R. 009490 appears to address proposed bridge routes, not pad size or location.

[70] Docket 214 (Pls.' Supp. Br.) at 15 (citing Docket 212-1 (SIR) at 11). *See also* A.R. 3998, cited in the SIR.

[71] *See* Docket 214 (Pls.' Supp. Br.) at 15 (citing *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Allen*, 615 F.3d 1122, 1135 (9th Cir. 2010)).

The Court observes that while the SIR's citations are to higher ground locations for the road and not the bridge, the Corps did not act unreasonably when it applied the same concept to the relocation of the adjacent pad. The Corps' findings that (1) the size of the pad is consistent with alternatives considered in the 2004 FEIS, and (2) the mitigating relocation of the pad to higher ground, do not constitute substantial changes relevant to environmental concerns were not arbitrary and capricious.

### 4. Substitution of Two Bridges for Culverts

The approved project design includes two additional bridges and eliminates several culverts that were analyzed in Alternatives A and F in the 2004 FEIS. Preliminarily, the SIR notes that the Corps "does not regulate, or permit, bridges; and, therefore, this change was not within the Corps' jurisdiction." But the SIR then evaluates these changes, and finds that the two additional bridges were "a mitigating measure *to reduce* the regulated footprint of gravel fill . . . and to reduce the hydrological impacts of a road in preference to use of culverts or culvert batteries as originally proposed."[72] The SIR also finds that "[b]y reducing impacts to surface hydrology, additional bridges help to minimize direct and secondary impacts to habitat . . . ."[73] The Court finds that the Corps has adequately evaluated this change and that the Corps' determination that it was not a substantial change relevant to environmental concerns was not arbitrary and capricious.

---

[72] Docket 212-1 (SIR) at 12 (emphasis in original); *see also discussion supra* n.48.

[73] Docket 212-1 (SIR) at 12.

## 5. Increase in Acreage of Impacted Waters of the United States

Other than the mitigation measures addressed below, the final change addressed in the SIR is the increase in the acreage of wetland habitat impacted by the CD-5 project. ConocoPhillips' 2004 proposal included 45.1 acres of impacted waters, which is increased to 58.5 acres in the 2011 permitted design. The SIR observes that this amount of impacted acreage is "close to Alternative F" (45.1 acres impacted) and "well within the mid-range of impacts discussed in the [2004 FEIS]," which ranged from 41.9 acres to 82.4 acres. The SIR adds that the "Corps imposed extensive mitigation as a condition of its approval, including compensatory mitigation at an unprecedented 10 to 1 ratio for Colville River Delta (CRD) wetlands directly affected and at a 3 to 1 ratio for direct and indirect impacts to non-CRD wetlands. . . . The ratios indicate that 3 or more acres will be protected for every acre that is impacted." For these reasons, and because the "[w]etland habitats impacted by ConocoPhillips' original proposal and by the approved design are substantially the same (palustrine tundra)," the SIR concludes that an SEIS was not required due to this increased acreage. [74]

Plaintiffs respond that (1) the 30% increase in impacted wetlands is significant, and (2) "much more importantly," the Corps did not take into account "what types of wetlands will be lost, what their values and functions are, and what the impact of that loss is on the environment."[75] Specifically, Plaintiffs assert that the Corps did not identify any record

---

[74] Docket 212-1 (SIR) at 13.

[75] Docket 214 (Pls.' Supp. Br.) at 15-16.

citation to support its conclusion that the wetlands in the permitted project are substantially the same as those impacted in the original proposal.

The Court finds that the mitigation measures, combined with the fact that the acreage is within the range considered by the 2004 FEIS, adequately support the Corps' decision that an SEIS was not required due to the increased acreage. And although the SIR does not contain any references to the record describing the specific wetland habitats that would be impacted, this topic was discussed in some detail in the 2011 ROD.[76]

### 6. Mitigation Measures

The SIR lists 13 changes made to the project after the 2004 FEIS that it identifies as mitigation measures.[77] For each such measure, the SIR provides a brief description of the source of the measure (for example, an agency comment) and the reasoning behind it. The SIR maintains that "[m]itigation measures that have been implemented to reduce the adverse impacts of a proposal are not adverse consequences in and of themselves that may require supplementation."[78]

Plaintiffs assert that these "mitigation measures warrant preparation of an SEA or SEIS because the associated changes to the project are substantial and those mitigation

---

[76] A.R. 6872-6875 (2011 ROD); *see also* A.R. 203-204 (FEIS).

[77] Docket 212-1 (SIR) at 14-18.

[78] Docket 212-1 (SIR) at 3 (citing *N. Idaho Cmty. Action Network v. U.S. Dep't of Transportation*, 545 F.3d 1147, 1157 (9th Cir. 2008)).

measures were never addressed in a NEPA analysis."[79]  Plaintiffs contend that "[t]he analysis of the mitigation measures must be in the EA or EIS" and that such analysis was not done for all of the measures. [80]  To the extent that certain mitigation measures were considered in the 2004 FEIS, Plaintiffs assert that "the 2004 EIS lacks sufficient detail of these measures, provides no assessment of the effectiveness of these measures, and fails to identify any underlying analytical data to support why these measures were chosen."[81]  Plaintiffs also correctly note that certain references in the SIR to the administrative record do not fully support its conclusions.[82]

In *Russell Country Sportsmen v. U.S. Forest Service*, the Ninth Circuit reviewed a modification to the Forest Service's national forest travel management plan that lessened the environmental impact of an alternative discussed in a draft EIS, among other changes.[83]  The district court had granted the plaintiffs' motion for summary judgment and held that supplementation was required.  On appeal, the Ninth Circuit reversed, and held that while mitigating measures may sometimes require supplementation, the modification at issue eliminated an adverse impact, and left "only the impacts . . . that

---

[79] Docket 214 (Pls.' Supp. Br.) at 18.  Docket 214 (Pls.' Supp. Br.) at 20 (identifying measures that Plaintiffs assert were not addressed, or not addressed in sufficient detail, in the 2004 FEIS).

[80] Docket 214 (Pls.' Supp. Br.) at 18 (citing *Neighbors of Cuddy Mtn. v. U.S. Forest Serv.*, 137 F.3d 1372, 1380-81 (9th Cir. 1998)).  *See also* Docket 214 (Pls.' Supp. Br.) at 18.

[81] Docket 214 (Pls.' Supp. Br.) at 20 (internal quotation marks omitted).

[82] Docket 214 (Pls.' Supp. Br.) at 21.

[83] 668 F.3d 1037, 1047-49 (9th Cir. 2011).

have already been fully considered" in the draft EIS.[84] "That a modified alternative only lessens environmental impacts may tend to show that the new alternative is a 'minor variation of one of the alternatives discussed in the draft EIS' and is 'qualitatively within the spectrum of alternatives that were discussed in the draft [EIS].'"[85]

Plaintiffs appear to maintain that mitigation measures always require a NEPA analysis. Based on *Russell County*, the Court does not to read the law to so require. Rather, an agency to should evaluate each mitigation measure to assess whether that measure may lead to an adverse environmental impact.[86] The Court finds the Corps adequately undertook this task with respect to each of the mitigation measures identified. Moreover, Plaintiffs do not identify any mitigation measures that could lead to adverse impacts. Accordingly, the Court finds that the Corps' determination that the addition of the mitigation measures did not necessitate preparation of an SEIS was not arbitrary and capricious.

### 7. Piecemeal Consideration of Changes

Plaintiffs argue that the Corps' analysis of the project changes inappropriately "cobbl[ed] together" alternatives considered separately in the 2004 FEIS.[87] Plaintiffs

---

[84] 668 F.3d at 1049.

[85] 668 F.3d at 1048 (quoting Forty Questions, 46 Fed. Reg. at 18,035).

[86] *See N. Idaho Cmty. Action Network*, 545 F.3d at 1157 (finding that mitigating changes "were not adverse consequences in and of themselves" and it was accordingly not arbitrary or capricious for the agency not to prepare an SEIS, although the agency in *N. Idaho* did prepare both an EA and a reevaluation).

[87] Docket 214 (Pls.' Supp. Br.) at 13-14.

assert that the "Corps errs by attempting to piecemeal how each project change was considered in one alternative or another."[88]  The Court finds, however, that the Corps conducted a reasoned evaluation by analyzing each change along with the relevant mitigation measures.  The fact that each of the changes to the project was examined separately in the SIR does not render the agency's determination arbitrary and capricious.

### b.  New Information

Supplementation is required if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[89]  In the initial summary judgment briefing, Plaintiffs had listed eleven post-2004 documents cited by the Corps in the 2011 ROD.[90]  The 2011 ROD, however, concluded that "there are not significant new circumstances or information relevant to environmental concerns and bearing on the proposal or impacts."[91]  But the Corps relied on post-2004 information in making its determination regarding the change in the LEDPA under the Clean Water Act.[92]  In its May 2014 Order, the Court agreed with the Plaintiffs that "absent a reasoned explanation in the record, the Corps' decision to rely on certain post-2004 studies and information in evaluating the LEDPA for Conoco Phillips's CD-5 proposal

---

[88] Docket 214 (Pls.' Supp. Br.) at 14 (citing *Miccosukee Tribe of Indians of Florida v. United States*, 420 F. Supp. 2d 1324, 1334 (S.D. Fla. 2006)).

[89] 40 C.R.F. § 1502.9(c)(ii).

[90] Docket 108 (Pls.' Mot. for Summ. J.) at 42-43.

[91] A.R. 6899 (2011 ROD); *see also* A.R. 6814, 6816, 6837-38 (2011 ROD).

[92] Docket 175 (Order re Mots. for Summ. J.) at 49.

under the CWA, while at the same time summarily disclaiming the significance of that information for NEPA purposes, was arbitrary."[93]  The Court remanded the permit decision to the Corps to provide "a reasoned explanation as to whether or not the 2004 [FEIS] warrants supplementation to address the changes in the CD-5 project since the 2004 [FEIS] and the new information relied upon by the Corps in its permitting decision."[94]

The SIR addresses this issue in its "Conclusions" section.  First, the SIR observes that "a LEDPA determination under the CWA and an assessment of environmental impact significance under NEPA have different purposes, function and scopes."[95]  The SIR explains that "environmental impact analysis under NEPA focuses on the context and intensity of an impact, and leads to a finding that the impacts from a given activity on a given resource fall along a spectrum ranging from none, negligible, minor, and moderate to significant."[96]  In contrast, a LEDPA determination is "focused on CWA jurisdictional areas for the CD-5 project" and "examines the evidence necessary to determine which project design, among those that are practicable, will have the least adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."[97]  The SIR then addresses each of the post-2004

---

[93] Docket 175 (Order re Mots. for Summ. J.) at 50.

[94] Docket 199 (Order re Further Proceedings) at 9-10.

[95] Docket 212-1 (SIR) at 22.

[96] *Id.* at 22.

[97] *Id.* (SIR) at 22 (citing 40 C.F.R. § 230.10(a)).

documents identified by Plaintiffs and explains, in somewhat conclusory fashion, why each document did not "constitute or include 'significant new information' sufficient to trigger an obligation to supplement the 2004 FEIS pursuant to the CEQ's NEPA."[98]

Plaintiffs maintain that the Corps has "once again failed to provide any explanation as to how the post-2004 information on the one hand could be so significant and pivotal to the agency's change in position on the LEDPA, while at the same time dismissing the significance of that new information for purposes of NEPA."[99]  Plaintiffs also assert that "the Corps' explanation of its reasoning in the SIR is so sparse that it is nearly impossible to determine the degree of care with which the agency considered the information."[100] Plaintiffs focus on the HDD alternative, and maintain that "[t]he Corps' recitation of the applicable standard and conclusory statements in the SIR about the HDD White Paper and agency concerns do not satisfy the Corps' obligation to provide a reasoned determination."[101]

The Corps' supplemental brief addresses the agency's different consideration of the post-2004 information under the CWA and under NEPA as follows:

> The post-2004 information was relevant to the ranking of risks for the purposes of finding the least environmentally damaging practicable alternative as required by the CWA, but that information did not expand the scope of environmental impacts or provide significant new information

---

[98] *Id.* at 23-28.

[99] Docket 214 (Pls.' Supp. Br.) at 22.

[100] *Id.* at 22.

[101] *Id.* at 23.

about impacts beyond those that were considered in the Alpine Satellites FEIS.[102]

ConocoPhillips emphasizes that the "2011 [ROD] decision *realigned* the CD5 permit decision with the findings of the [2004] FEIS because it permitted a design 'very similar to the Alternative F theme that was analyzed in the [2004] FEIS."[103] It maintains that the post-2004 information considered by the Corps served two different purposes:

> As to hydrological impacts . . . the new information, principally project changes that ameliorated adverse impacts, *confirmed* the scope and intensity of environmental impacts assessed in the Alpine Satellites FEIS. As to risks associated with potential oil spills, monitoring for spills, and spill response, it was new information about the *technological and logistical differences* among design options, not environmental impacts, that mattered to the LEDPA decision.[104]

ConocoPhillips also asserts that Plaintiffs' argument regarding the Corps' change in position on HDD from the 2010 permit denial to the 2011 ROD is not relevant to Plaintiffs' NEPA claim, because NEPA is procedural and "in no way dictates [the Corps'] substantive permit decision."[105] ConocoPhillips also notes that even if the SIR "is not of ideal clarity" on this issue, "neither the purposes of NEPA nor justice would be served if ConocoPhillips' CWA permit were vacated because of an oversight regarding FEIS cites

---

[102] Docket 218 (Corps' Supp. Br.) at 16.

[103] Docket 215 (ConocoPhillips' Supp. Br.) at 20 (emphasis in original).

[104] *Id.* at 18-19 (emphasis in original).

[105] *Id.* at 22.

. . . ."[106]  To that end, ConocoPhillips includes relevant record cites from the 2004 FEIS that support the agency's conclusions.[107]

A court may "uphold a decision of less than ideal clarity if the agency's path may be reasonably discerned."[108]  In *Greer Coalition, Inc. v. U.S. Forest* Service, the Ninth Circuit held that new information providing "analysis conducted pursuant to comments on a draft EIS" and "confirm[ing] information already in the record" did not require supplementation of an EIS because the new information was not significant.[109]  Here, the Court is generally able to follow the Corps' explanation as to why it concluded that each of the new documents identified by Plaintiffs did not provide significant new information relevant to environmental concerns for NEPA purposes.  Moreover, the Corps has now adequately explained why the LEDPA change is not inherently inconsistent with its finding that an SEIS was not required under NEPA.  Given the Ninth Circuit's emphasis that "deference to the agency's decisions is especially warranted when reviewing the agency's technical analysis and judgments, based on an evaluation of complex scientific data within the agency's technical expertise,"[110] the Court finds that the Corps' determination

---

[106] *Id.* at 22, n.70.

[107] *See id.* at 21 n.69 & 22.

[108] *Nw. Coal. for Alternatives to Pesticides (NCAP) v. EPA*, 544 F.3d 1043, 1048 (9th Cir. 2008) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

[109] 470 F. App'x 630, 633-34 (9th Cir. 2012).

[110] *Native Village of Point Hope v. Salazar*, 680 F.3d 1123, 1130 (9th Cir. 2012) (internal quotation marks omitted).

that the post-2004 documents did not constitute significant new information for NEPA purposes was not arbitrary or capricious.

### c. Climate Change

Pursuant to the parties' agreement, the Court ordered the Corps on remand to "address whether post-2004 climate change information warrants the preparation of an SEIS."[111] The Order simply adopted the parties' stipulation on this issue and contained no other directive to the Corps as to what specific information it was to address or how it should evaluate that information.[112] In the SIR, the Corps states that it "does not usually make an in-depth analysis of climate change in regards to Corps permit decisions," but nevertheless "chose to look at the effects of climate change on the proposed project as well as the effect of the proposed project on climate change in relation to NEPA."[113]

On this topic, the SIR first considers whether climate change will impact the project. The SIR acknowledges that "many new studies and volumes of research had occurred post-[2004] FEIS" but concludes that "[t]he only relevant new study reviewed that includes discussion/information regarding climate change that could have a bearing on the CD-5 project is BLM's Integrated Activities Plan EIS ["IAP/EIS"] (which is updated every few

---

[111] Docket 199 (Order re Further Proceedings) at 9.

[112] And yet, as Plaintiffs correctly note, the Corps' consideration of post-2004 climate change information is subject to the supplementation standard set out in 40 C.F.R. § 1502.9(c), which requires preparation of an SEIS when there are "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."

[113] Docket 212-1 (SIR) at 18.

years)."[114]  The Corps states that "no project-specific requirements had been implemented which affected the Corps['] decision regarding additional NEPA analysis." The SIR adds that "the impacts identified in recent studies" (which is apparently referring only to BLM's IAP/EIS and updates) "were similar to those described in the 2004 FEIS but with a potential for accelerated environmental changes like an increase in temperature, precipitation, sea-level rise or loss of permafrost while the FEIS focused on increased Green-House Gas (GHG) emissions, frequency of high-wind events, storm surges, cyclones, and sea-level rise."[115]  The SIR concludes that because "these changes are not quantifiable and there was no new regulatory requirement associated with any of them, the Corps determined that this new information related to climate change was not significant or relevant to environmental concerns bearing upon the proposed action or its impacts and, therefore, did not require preparation of a SEIS."[116]  The SIR also notes that the 2011 permit included a special condition "for adaptive management strategies which could be used to address annual incremental increases in impacts to the project caused by climate change."[117]

---

[114] *Id.* at 18-19.

[115] ConocoPhillips notes that the earlier version of the BLM IAP/EIS was summarized in the 2004 FEIS. Docket 215 (ConocoPhillips' Supp. Br.) at 24 & n.80.

[116] Docket 212-1 (SIR) at 19.

[117] *Id.* (citing A.R. 006892 (2011 ROD), which describes the special condition but contains no reference to climate change).

The SIR also considers whether the project would impact climate change.[118]   In this regard, it noted that "[m]ost climate change modeling in the Arctic seems to indicate an accelerated rise in temperature due to the loss of sea ice," and finds that because CD-5 "is located 3-4 miles from the coast and the placement of gravel during construction as a result of the Corps permit will not directly impact the Arctic Ocean in any way . . . the potential impacts of the CD-5 project on climate change were not considered a reason to require a SEIS."[119]

Plaintiffs criticize the SIR's conclusion that BLM's IAP/EIS is the only relevant new study.  However, they do not identify other relevant information that they maintain the Corps should have considered.  Plaintiffs do correctly note that the Corps fails to identify "the qualitative analysis of climate change performed in 2011" that is referenced in the SIR.[120]   Plaintiffs also assert that the SIR should not have relied on the fact that these changed conditions are not "quantifiable" or associated with "new regulatory requirements" because these are improper criteria to apply for determining whether to supplement an EIS.[121]   Rather, the appropriate analysis is whether the information is

---

[118] Plaintiffs have indicated that "the project's contribution to climate change . . . is not at issue in this case."  Docket 214 (Pls.' Supp. Br. at 20 n.120).

[119] Docket 212-1 (SIR) at 19.

[120] *Id.*; Docket 214 (Pls.' Supp. Br.) at 26.

[121] Docket 214 (Pls.' Supp. Br.) at 26-27 (citing *Portland Audubon Soc'y v. Lujan*, 795 F. Supp. 1489 (D. Or. 1992)).

significant, relevant to environmental concerns and bears on the proposed action or its impacts.

The SIR states that "there are no Federal, state or local statutes requiring anything other than a 'consideration' of the potential impacts regarding climate change, GHGs, or global warming."[122] And the Corps found that there was not any climate change information that was specific to the CD-5 project that it determined necessitated an SEIS.[123] The Corps acknowledged the "growing body of knowledge/research associated with climate change," but found it was not significant in relation to this project.[124] Clearly, on remand the Corps performed only a minimalist review of the impact of climate change on the project. However, absent more precise instructions from the Court on remand as to the specifics of the analysis the Corps should have performed, or the identification of certain climate change information that Plaintiffs maintain the Corps should have considered that are relevant to this drilling pad project, the Court finds that the Corps' limited consideration of this topic was adequate and its decision not to prepare an SEIS

---

[122] Docket 212-1 (SIR) at 20. The SIR provides no authority for this statement, but Plaintiffs do not identify any authority to the contrary.

[123] *Id.* at 19. Neither the Corps nor ConocoPhillips responds to Plaintiffs' concern that the Corps failed to identify the "many new studies and volumes of research" the Corps indicated had been performed post-2004 which the Corps determined had not affected its decision regarding additional NEPA analysis. *Id.* And yet Plaintiffs do not identify any specific study or research project that they assert the Corps arbitrarily failed to consider.

[124] *Id.* at 20.

due to post-2004 information associated with climate change was not arbitrary or capricious.

### III.   Claim Two: Violation of Clean Water Act

Section 404 of the CWA governs permitting for the discharge of dredged or fill material into navigable waters.[125]   The Corps issues Section 404 permits according to EPA's Section 404(b)(1) Guidelines.[126]   Those guidelines state, in relevant part: "[N]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences."[127]   The provision requires the Corps to select what is referred to as the Least Environmentally Damaging Practicable Alternative, or "LEDPA."

The parties dispute the nature of the Corps' obligation to explain its permitting decision here, where the Corps' 2010 ROD initially denied ConocoPhillips' permit application because it found ConocoPhillips' proposal was not the LEDPA.  That ROD identified two alternatives that it found would have less environmental impact, both of which used a horizontal direction drilling ("HDD") pipeline instead of a bridge.[128] However, after ConocoPhillips' administrative appeal of the 2010 ROD, the Corps found

---

[125] 33 U.S.C. § 1344.

[126] 33 C.F.R. § 320.4(a)(1).

[127] 40 C.F.R. § 230.10(a).

[128] A.R. 4792-93 (2010 ROD).

that ConocoPhillips's modified bridge proposal was the LEDPA, instead of an HDD alternative.[129]   Plaintiffs assert that "when an agency changes course, it 'is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance.'"[130]   The Corps, however, contends that "an agency need explain a change in course only when a subsequent *final* agency action alters an earlier *final* agency action, and even then only under limited circumstances."[131] The Corps and ConocoPhillips correctly observe that the 2010 ROD was not a final agency action because ConocoPhillips successfully pursued an administrative appeal of that initial permitting decision.[132]

In *F.C.C. v. Fox Television Stations, Inc.*, the Supreme Court held that there is "no basis in the Administrative Procedure Act or in our opinions for a requirement that all agency change be subjected to more searching review."[133]   However, "the requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position."[134]   And yet an agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than

---

[129] A.R. 6773-76, 6902 (2011 ROD).

[130] Docket 108 (Pls.' Summ. J. Br.) at 46 (quoting *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin (NEDC)*, 477 F.3d 668, 687-88 (9th Cir. 2007)).

[131] Docket 131 (Corps' Summ. J. Br.) at 15 (emphasis in original)

[132] *Id.* at 16 (citing 33 C.F.R. § 331.10).   Docket 127 (ConocoPhillips' Summ. J. Br.) at 34.

[133] 556 U.S. 502, 514 (2009).

[134] *Id.* (emphasis in original).

the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates."[135]   However, "a more detailed justification than what would suffice for a new policy created on a blank slate" may be required when an agency's "new policy rests upon factual findings that contradict those which underlay its prior policy."[136]   Neither party directs the Court to Ninth Circuit precedent that addresses whether an agency's change in position following an administrative appeal from an initial ROD requires the "more detailed justification" envisioned by the Supreme Court when an agency changes its policy.[137]   But the Court need not decide the applicable standard because it finds the Corps has satisfied even a heightened standard to explain its reasoning for the LEDPA change, as discussed below.

Plaintiffs assert that the Corps failed to adequately explain and support its final decision to approve the road and bridge proposal when it had previously identified concerns about the environmental impacts of that proposal within the Colville River Delta.

---

[135] *Id.* (emphasis in original).

[136] *Id.*

[137] The Ninth Circuit's case law on this topic speaks primarily to an agency's change from a prior precedent or policy.  *See Northwest Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 688, 687 (9th Cir. 2007) ("In this case, BPA departed from its long-standing practice of funding a unitary Fish Passage Center and transferred the FPC's functions to two separate entities.").  *Northwest Envtl. Def. Ctr.* quoted *Greater Boston Television Corp. v. FCC*'s holding that "an agency changing its course must supply a reasoned analysis indicating that *prior policies and standards* are being deliberately changed, not casually ignored, and if an agency glosses over or swerves from *prior precedents* without discussion it may cross the line from the tolerably terse to the intolerably mute." 444 F.2d 841, 852 (D.C. Cir. 1970) (emphasis added).  The Supreme Court's opinion in *Fox Television* also speaks to a change in agency policy.  556 U.S. at 515.

Specifically, Plaintiffs point to the Corps' previous emphasis on the hydrologic impacts within the Delta when it had previously rejected ConocoPhillips' proposal.[138]  Plaintiffs also assert that the Corps' reliance on the fact that ConocoPhillips' proposal would have a smaller gravel footprint in support of the LEDPA determination is arbitrary, given the Corps' previous determination that the size of the footprint was not determinative of the LEDPA.[139]

The Corps responds that it fully examined its change in the LEDPA determination. It explains that the change was the result of (1) the agency's receipt of new information regarding the environmental consequences of the HDD pipeline, and (2) the redesign of the road and bridge alternative to reduce the impacts to the Delta.[140]  The Corps also states that the size of gravel footprint was only one of several criteria that were analyzed and disputes Plaintiffs' assertion that it was determinative.[141]  ConocoPhillips cites to additional portions of the 2011 ROD that it maintains support the Corps' findings.[142]

Plaintiffs also assert that the Corps "did not provide a reasoned analysis explaining its change in position regarding the risk of an oil spill" when comparing a suspended

---

[138] Docket 108 (Pls.' Summ. J. Br.) at 48 (citing AR 4821, 4828, 4793, 4805, 4844 & 4856).

[139] Docket 108 (Pls.' Summ. J. Br.) at 50.  The 2010 ROD found that "[c]hanges in hydrologic regime due to roads would likely be less substantial than in Alternative 2 [despite a larger gravel footprint] since the road alignment is outside of the [Colville River Delta]. . . .  This alternative would avoid impacting . . . higher value wetlands within the [Colville River Delta]." A.R. 4844.

[140] Docket 131 (Corps' Summ. J. Br.) at 20.

[141] *Id.* at 21.

[142] Docket 127 (ConocoPhillips' Summ. J. Br.) at 36-38.

pipeline with the HDD alternative.[143]  Plaintiffs observe that much of the information pertaining to the risks of the HDD alternative had been available prior to the Corps' first ROD that had identified the HDD option as the LEDPA.  Plaintiffs assert that the Corps did not adequately explain why in the 2011 ROD "the potential for undetected leaks and spill response" associated with HDD outweighed the "concerns about a large surface spill" associated with ConocoPhillips' proposal.[144]  Plaintiffs also state that because the actual risks of spills were not quantified for each alternative, the Corps' explanation was inadequate.  Plaintiffs add that the 2011 ROD failed to address the Corps' earlier concern that a catastrophic spill from a suspended pipeline, while unlikely, would have devastating consequences in the Colville River Delta.[145]

The Corps responds that oil spills from a pipeline are secondary effects under the Section 404(b)(1) Guidelines and, accordingly, need only be "considered" in determining whether an alternative has "other significant adverse environmental consequences"  -- a quantitative analysis of the risks of secondary effects is not required.[146]  The Corps maintains that it did consider the risk of oil spills and points to the 2011 ROD's analysis pertaining to the relative ease of identifying, accessing, stopping, and cleaning up an oil

---

[143] Plaintiffs rely on *Motor Vehicles*, 463 U.S. at 46, 55-56, which faulted the National Highway Traffic Safety Administration for failing to articulate a basis for rejecting a modification of a rescinded motor vehicle safety standard.

[144] Docket 108 (Pls.' Summ. J. Br.) at 51.

[145] *Id.* at 54.

[146] Docket 131 (Corps' Summ. J. Br.) at 22-23 (citing 40 C.F.R. § 230.11 of the Section 404(b)(1) Guidelines for Specification of Disposal Sites for Dredged or Fill Material).

spill from a suspended pipeline. ConocoPhillips asserts that there are no expert opinions contrary to the Corps' findings in the record.[147]  In their reply, Plaintiffs emphasize the inadequacy of the explanation of the Corps' change in position, arguing that "the question is not whether the contents of the second decision would have been adequate if it had been published as the only decision."[148]

The Court finds that 2011 ROD adequately explains and supports its determination that the road and bridge alternative adopted in the 2011 ROD was the LEDPA.  Regarding the change from the initial ROD, the 2011 ROD includes a multi-page discussion, including the following statement by the District Commander:

> During the remand information presented . . . led me to reconsider the environmental consequences associated with the roadless scenario [an HDD pipeline] that had been previously determined to be a potential LEDPA.  The environmental consequences are specifically relate to pipeline corrosion and monitoring, leak detection, spill prevention and spill response. I have reviewed all the information and concluded that there are additional environmental consequences of a limited access development at CD-5, related to leak detection and spill response that make CPAI's alternative the LEDPA.[149]

The 2011 ROD acknowledged that these same environmental concerns were also considered during the preparation of the 2010 ROD, but stated that following the administrative remand, "the State and Federal agencies with recognized expertise in

---

[147] Docket 127 (ConocoPhillips' Summ. J. Br.) at 38-41.

[148] Docket 146 (Pls.' Reply) at 38.

[149] A.R. 6773 (2011 ROD).

pipeline monitoring have provided information and emphasized these concerns."[150] Specifically, the District Commander explained in the 2011 ROD that information provided by the State Pipeline Coordinator's Office ("SPCO") "increased my understanding and awareness of the increased corrosion risk, maintenance concerns, leak detections, and spill response associated with three-phase liquid (unprocessed crude) pipelines." He added, "[t]o my understanding and knowledge there are no three-phase HDD pipelines in the U.S. Arctic."[151]

Concerns related to the aquatic environment were also discussed in the initial ROD. The 2011 ROD acknowledged the prior balancing of spill risk and aquatic harm in that initial ROD and states that "[d]uring the remand, information provided by [ConocoPhillips], the SPCO and the [Federal Joint Pipeline Coordinator's Office] led me to reconsider the risk to the aquatic resources resulting from a roadless operation in the [Colville River Delta]."[152] The 2011 ROD further explained that the revised road and bridge proposal

> has avoided and minimized impacts within the 100-year and 500-year floodplain to the maximum extent practicable by an additional swale bridge, reduced the width of the bridges, which would result in reduction in the size of the abutments, and reduced the width of the road within the [Colville River Delta]. Furthermore, the year round access provided by a road would minimize the potential adverse environmental consequences in the event of a leak.[153]

---

[150] A.R. 6773 (2011 ROD).

[151] A.R. 6774 (2011 ROD).

[152] A.R. 6775 (2011 ROD).

[153] A.R. 6775 (2011 ROD).

The 2011 ROD also considered the criteria provided by the 404(b)(1) Guidelines and found that the roadless HDD option would not comply with the Section 404(b) Guidelines while ConocoPhillips' modified road and bridge proposal would. The 2011 ROD also considered comments that the Corps had received on this issue and, in response, acknowledged and explained its change in position.[154]

Based on the foregoing, the Court finds that the 2011 ROD acknowledged that the Corps had changed its position from the initial decision and provided a reasoned explanation for that change. The Court also finds that the Corps has provided an adequate basis for its 2011 LEDPA determination. Accordingly, the Court finds that the Corps' LEDPA decision was not arbitrary and capricious even if a heightened standard of review is applied.[155]

//

//

//

//

---

[154] *See, e.g.*, A.R. 6808-09 (2011 ROD) ("During the initial review period the Corps agreed with the analysis of the EPA regarding spill risk. However, [ConocoPhillips] has submitted information on the analysis of leak detection and response and the Corps determined that the roadless scenario has a greater potential for a catastrophic spill than the roaded proposal, because of the period of time that the pipeline route would be inaccessible for inspection and repairs. [The Corps' previous assumptions regarding roadless development] proved to be no longer valid after [ConocoPhillips] fully addressed those issues during the remand.").

[155] *See supra* at 36-37.

**CONCLUSION**

For the foregoing reasons, the Court hereby ORDERS that

1.  Plaintiffs' Motion for Summary Judgment at Docket 107 is DENIED;[156]

2.  ConocoPhillips' and the Corps' Cross Motions for Summary Judgment at Docket 127 and 131, respectively, are GRANTED; and

3.  The Clerk of Court is directed to enter judgment accordingly.

DATED this 26th day of May, 2015, at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

---

[156] Likewise, Plaintiffs' Supplemental Briefing on Remand in Support of Plaintiffs' Original Motion for Summary Judgment at Docket 214 is DENIED.